Filed 8/12/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DENNIS LAMAR JAMES,<br><br>    Defendant and Appellant. | A139463<br><br>(Alameda County<br>Super. Ct. No. 169466)<br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 14, 2015, be modified as follows:

1. On page 16, the first sentence of footnote 4, the phrase "neither side addresses whether," the word "is," and the word "or" are to be deleted and replaced with the phrases "only appellant argues briefly that," "should be," and "rather than," so that the sentence reads:

> While the parties discuss prejudice, only appellant argues briefly that the refusal to give CALCRIM No. 3425 should be judged by the harmless beyond a reasonable doubt standard under *Chapman v. California* (1967) 386 U.S. 18, rather than the "reasonable probability" standard under *People v. Watson* (1956) 46 Cal.2d 818, 836.

The second sentence of footnote 4 remains the same. There is no change in the judgment.

1

Appellant's petition for rehearing is denied.


DATED: _____          _____
                                       RUVOLO, P. J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DENNIS LAMAR JAMES,<br><br>    Defendant and Appellant. | A139463<br><br>(Alameda County<br>Super. Ct. No. 169466) |

**I.**

**INTRODUCTION**

In a bifurcated trial, a jury found appellant Dennis Lamar James guilty of mayhem and assault producing great bodily injury, but then found him not guilty by reason of insanity. Appellant contends that the trial court erred in refusing to instruct the jury on unconsciousness as a defense to all charges during the guilt phase of the bifurcated trial.

We conclude that the evidentiary record included substantial evidence that appellant was unconscious, within the legal meaning of the defense of unconsciousness, when he committed the offenses, and the trial court erred in refusing to instruct the jury on that defense. Accordingly, we reverse the judgment.

**II.**

**PROCEDURAL AND FACTUAL BACKGROUNDS**

**A. Pretrial Procedural Background**

The Alameda County District Attorney filed an amended criminal information charging appellant with aggravated mayhem (Pen. Code[1], § 205) and assault likely to

---

[1] All further statutory reference are to the Penal Code, unless otherwise indicated.

produce great bodily injury (§ 245, subd. (a)(4)) on Yvette Thigpen on February 19, 2012. The amended information also alleged that appellant had suffered three prior convictions, one of which was a serious felony within the meaning of section 667, subdivision (a)(1). Other sentencing enhancement allegations were included. Appellant entered a plea of not guilty to the charges and denied the special allegations.

Appellant changed his plea on December 28, 2012, adding a not guilty by reason of insanity plea. The trial court then appointed two alienists to perform evaluations of appellant's mental condition pursuant to section 1026; Dr. Marlin Griffith, and Dr. David Howard, both clinical psychologists. Both reports were received by the court as of March 13, 2013.

Dr. Griffth's report contained information about appellant's mental health history including that he had been shot in the back of the head in 1998 in a gang-related incident, as a result of which he had subsequently experienced a "seizure disorder." A second head trauma occurred in March 2011. Appellant had an extensive psychiatric history since his initial head injury that included diagnoses for "Mood Disorder, Posttraumantic Stress Disorder (PTSD), Polysubstance Dependence, and seizures."

The report also noted that appellant was a regular user of cocaine and marijuana, and that he also occasionally used ecstasy, methamphetamine, acid, and mushrooms, "but was more focused on the drug sales lifestyle."

After reviewing the medical records relating to appellant's past mental history, and after conducting an interview, Dr. Griffith opined as follows:

"It is my opinion, with reasonable medical certainty, that at the time of the referenced offense, Mr. James suffered a Psychotic Disorder NOS [not otherwise specified] on 02/19/12. A Psychotic Disorder NOS is diagnosed in situations in which psychosis is present but it is not determined if it is primary, due to a general medical condition, or substance induced. A Substance-Induced Psychotic Disorder is a likely possibility but no toxicology screen was noted in the Highland Hospital medical records. His mental status cleared relatively quickly and subsequent treatment at Santa Rita Jail

2

focused on his previous history of psychiatric conditions.  No further psychotic symptoms were reported."

Finally, Dr. Griffith concluded: "Based on this forensic assessment, it is my opinion, to a reasonable degree of medical certainty, that **at the time of the commission of the offense, [appellant] was not capable of knowing or understanding the nature and quality of his act and of distinguishing right from wrong."**  (Original bolding.)

Dr. Howard's report chronicled much of the same mental health and illicit drug history as did Dr. Griffith.  However, unlike Dr. Griffith, Dr. Howard concluded that the aberrant behavior exhibited by appellant on February 19, 2012, was more likely the result of either drug-induced psychosis or drug-induced delirium:

"I **DO NOT** believe that [appellant's] established mental illness of PTSD or Mood Disorder, NOS accounts for his behavior when he committed Aggravated Mayhem against [the victim].  At the time of this offense there was no indication that [appellant] was re-experiencing the earlier traumatic incident from his past (gunshot wound to the head) by flashbacks or triggers related to the trauma.  His vague mood disorder, most notably a mixed presentation of depression and anxiety, would also not account for his state or his behavior.  It is my opinion that *a more likely diagnosis at the time of the incident would either be Drug Induced Psychosis or Drug Induced Delirium.*  Whether this was voluntary or involuntary is obviously beyond the scope of this evaluation."  (Original bolded italics; original underscoring omitted.)  Contrary to Dr. Griffith's ultimate opinion, Dr. Howard expressed the view that appellant was not legally insane at the time of the alleged crimes.

A pretrial conference was held with counsel on June 18, 2013, to discuss, among other things, the sequencing of trial and pending in limine motions.  The court confirmed there would be a guilt phase followed by an insanity phase if the jury convicted appellant of any charges at the conclusion of the guilt phase.  One of the motions made by the

3

prosecution was that an Evidence Code section 402[2] hearing be held before the defense presented any expert testimony concerning appellant's mental condition at the time of the events described in the amended information. The court granted the motion.[3]

## B. Evidence Presented During the Guilt Phase

The first witness called by the prosecution during the guilt phase was Oakland Police Officer Bobby Ko. It was Ko who responded on February 19, 2012, to a call that a mentally disturbed person was behaving violently at a senior housing complex on MacArthur Boulevard in Oakland. Appellant was attempting to climb the exterior of the building, and was running around the parking lot "crashing his head into cars and garbage cans."

Yvetta Thigpen, a resident of the complex, was looking out of her window and saw several people running away. She also saw appellant ramming his head into cars and taking off his clothes. She went outside because she thought she saw her niece. Appellant ran up to Thigpen and asked her to give him a kiss. He then put his hands on either side of her face, bit her mouth, and tried to put his tongue in her mouth. Appellant bit her multiple times, causing injuries to her mouth and face requiring stitches. Thigpen described her face as "mangled like a wild man got ahold of me." He then hit her on the side of her head and knocked her down.

---

[2] Evidence Code section 402 provides: "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [¶] (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests. [¶] (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

[3] Although the motion was granted, the record contains no transcript of an Evidence Code section 402 hearing being held before Dr. Griffith began his testimony during the defense case of the guilt phase. Although the clerk's minutes of that morning reflects that the trial judge and counsel met in chambers to discuss a "legal matter," that conference was not reported. Therefore, the record is silent as to whether the admissibility of Dr. Griffith's proposed testimony was discussed.

4

When Officer Ko arrived, he announced "Oakland Police" and told appellant to get on the ground. Appellant turned to face him, but then began "running back and forth, kind of full speed" between two parked cars, and he was "kind of mumbling." He was wearing only basketball shorts and socks and waving his hands in the air. Officer Ko saw Thigpen sitting on the curb holding her mouth with blood all over her hands. Officer Ko ordered appellant to get down on the ground, and appellant did not comply. Officer Ko used his Taser and tased appellant three to four times to gain his compliance before appellant turned and "tackled" Thigpen, pushing her into the landscaping. Appellant had Thigpen in a "bear hug" and appeared to be trying to kiss her. Officer Ko pulled appellant from Thigpen, and appellant was laying on the ground mumbling. Appellant got up, clenched his fists and took a step toward the officer, so Officer Ko deployed his Taser again. Appellant dropped to the ground, but then started to crawl toward Thigpen again. When Officer Ko threatened to use the Taser again, appellant responded "Tase me."

Two additional officers arrived on the scene. Appellant picked up some keys and walked toward a parked car. After an ineffectual attempt to tase appellant again, two officers grabbed appellant by each arm while appellant continued to struggle. The officers had difficulty subduing appellant, who was trying to keep his arms from being put into handcuffs. After appellant was handcuffed, he continued to struggle and attempted to get up off the ground.

During the incident, appellant was yelling and mumbling, but Officer Ko could not discern what he was saying. Officer Ko testified that at no time during his interactions with appellant did he respond to his commands or reply, other than with incoherent mumbling.

The only witness called by the defense was Dr. Griffith. The expert testified that appellant had a traumatic brain injury when he was 17 years old and suffered from a seizure disorder and posttraumatic stress. From his review of the records and his examination of appellant, Dr. Griffith believed that at the time of the events on February 19 appellant suffered a severe or bizarre psychotic episode, which meant "a

5

brief episode of psychosis or loss of touch with reality." Dr. Griffith emphasized that appellant was running around in an aimless manner, his speech was nonsensical, and that he did not appear to be aware of the police attempting to get control of him. He opined that appellant "did not have awareness of what took place at that time." Appellant "had no knowledge of his behavior during the incident," and he had no recollection of his actions, or of being tased. Dr. Griffith testified that this lack of awareness was not unusual for one experiencing a psychotic episode.

Dr. Griffith hypothesized about the cause of appellant's psychotic episode. He considered that appellant could have been suffering a substance-induced psychotic disorder from either legal or illegal drug use. He noted appellant had been prescribed psychotropic medication that included mood stabilizers and antidepressants, but was not taking them at the time of incident. Appellant's mother told Dr. Griffith that appellant ran out of his medication and she was trying to get him a new prescription.

The record also revealed that appellant was a regular user of cocaine and marijuana and also used methamphetamine, acid, mushrooms, and ecstasy. In addition, appellant's mother told Dr. Griffith that she smelled marijuana at the apartment on the day of the incident. However, no toxicology screening was performed on appellant after the incident.

Ultimately, Dr. Griffith opined that he did not think appellant was suffering from a substance-induced psychosis because appellant's "mental state cleared fairly quickly" after the events at the senior housing complex, and in drug-induced psychotic episodes mental state recovery usually occurs gradually and takes more time. The expert also noted that once appellant reached the hospital, he was able to follow instructions, although did not respond verbally to the medical staff.

### C. Court's Ruling on Unconsciousness Instruction

At the conclusion of the prosecution's case in the guilt phase, appellant made a motion pursuant to section 1118.1 to dismiss the aggravated mayhem charge, arguing there was insufficient evidence of specific intent to support a conviction. As part of the motion, defense counsel argued that appellant was incoherent and "essentially in an

6

unconscious state" at the time of the incident underlying the charge. The court denied the motion, finding there were two factors undermining a finding on unconsciousness: (1) Thigpen testified that appellant told her to kiss him, and (2) Officer Ko testified that appellant said "tase me." The court found saying "tase me" was "responsive to something that the officer was saying to him" and weighed against the notion he was unconscious.

Defense counsel also requested the court to instruct the jury with CALCRIM No. 3425, an instruction on unconsciousness as a defense. Defense counsel argued that, based on Dr. Griffith's testimony, appellant was suffering from a psychotic episode and he was unaware of his actions. "Mr. James was unaware . . . unable to interact, coupled with the testimony regarding my client's inability to remember, it is enough to raise reasonable doubt as to whether or not he was conscious at the time of the alleged incident." The court declined to give the instruction, stating "I don't think psychotic disorder, psychotic episode, altered reality, his reference to his own reality or nonresponsiveness to police officers' instructions is to be equated with unconsciousness." The court found that an "altered reality" was not unconscious: "It's consciousness, but on some total different pla[ne]."

The jury then found appellant guilty of mayhem, the lesser included offense to aggravated mayhem, and assault producing great bodily injury.

**D. Sanity Phase of Trial**

The sanity phase of the trial followed on July 1. The only witness called was Dr. Griffith, who testified largely in conformity with his earlier testimony during the guilt phase. Specifically, the expert reiterated the psychotic disorder that impaired appellant's mental state was not "substance induced." In fact, much of this later testimony from Dr. Griffith focused on the question of whether and to what extent appellant's behavior during the incident at the senior housing complex was the result of voluntary drug use. For example, Dr. Griffith was asked a question proffered by a juror as to what appellant had told him about his drug use prior to the incident. The witness related that appellant admitted to having smoked some marijuana the night before and that he had used cocaine

7

for several months before the incident. Dr. Griffith did not think that use of marijuana alone would lead to violent, aggressive or assaultive types of behavior.

After Dr. Griffith's testimony concluded, the court delivered four jury instructions to the panel, including CALCRIM No. 3450. The instruction included the following admonitions:

"The defendant was legally insane if:

"1. When (he/she) committed the crime[s], (he/she) had a mental disease or defect;

"AND

"2. Because of that disease or defect, he was incapable of knowing(he/she) did not know or understand the nature and quality of (his/her) act or did not know or understand that (his/her) act was morally or legally wrong.

"None of the following qualify as a mental disease or defect for purposes of an insanity defense: personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts.

"Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off. Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity.

"If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A settled mental disease or defect is one that remains after the effect of the drugs or intoxicants has worn off."

The jury found appellant not guilty by reason of insanity. Thereafter, appellant was committed to the Napa State Hospital for a maximum term of 21 years. This appeal followed.

8

## III.

## DISCUSSION

### A. General Law on the Issue of Consciousness As a Defense to Criminal Charges

Appellant argues that the court erred in refusing to instruct the jury on the defense of unconsciousness. He asserts there was evidence before the court to support the instruction, and therefore appellant was deprived of his constitutional right to present a defense by the court's refusal to give the requested instruction. Respondent contends the defense is precluded under California precedent, the expert testimony at trial on the issue of appellant's mental state was improper and, in any event, there was insufficient evidence of unconsciousness to warrant the instruction.

Turning first to the law on consciousness in the criminal mental state context, we begin with the presumption that a person who appears to act in an apparent state of consciousness is conscious. (*People v. Hardy* (1948) 33 Cal.2d 52, 63-64 (*Hardy*).) Therefore, the burden is on a criminal defendant to produce evidence rebutting this presumption of consciousness. (*People v. Cruz* (1978) 83 Cal.App.3d 308, 330-331 (*Cruz*).) Evidence raising a reasonable doubt as to whether the defendant was conscious at the time of acting is a complete defense to a criminal charge. (§ 26, subd. 4; *People v. Rogers* (2006) 39 Cal.4th 826, 887.)

Consistent with this presumption and the burden of proof, if a defendant presents substantial evidence of unconsciousness, the trial court must provide an instruction to the jury. (*People v. Newton* (1970) 8 Cal.App.3d 359, 377 (*Newton*).) Substantial evidence is "evidence sufficient for a reasonable jury to find in favor of the defendant." (*People v. Salas* (2006) 37 Cal.4th 967, 982, citing *Mathews v. United States* (1988) 485 U.S. 58, 63.) Where a defendant provides evidence of involuntary unconsciousness, "the refusal of a requested instruction on the subject, and its effect as a complete defense if found to have existed, is prejudicial error. [Citations.]" (*Newton*, at p. 377.) "The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon . . . . However incredible the testimony of a defendant may be

he is entitled to an instruction based upon the hypothesis that it is entirely true. [Citations.]" (*People v. Burns* (1948) 88 Cal.App.2d 867, 871 (*Burns*).)

" 'If the state of unconsciousness is caused by voluntary intoxication, however, it is not a complete defense.' [Citation.]" (*People v. Kelly* (1973) 10 Cal.3d 565, 573 (*Kelly*), quoting *People v. Conley* (1966) 64 Cal.2d 310, 323.) It can negate specific intent, but is no defense to a general intent crime. (*Ibid.*) "[C]riminal responsibility in a general intent crime is justified where a defendant is voluntarily intoxicated to the point of unconsciousness even though there was no actual intent to commit a crime because a defendant may not avoid the criminal harm caused by his or her failure to act 'with reason and conscience.'. . ." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1326, citing *People v. Velez* (1985) 175 Cal.App.3d 785, 794 (*Velez*).)

Therefore, if the evidence raises a reasonable doubt that the defendant was conscious at the time of the alleged criminal conduct, unconsciousness is a complete defense to both general and specific intent crimes. However, if the jury finds the unconsciousness was the result of voluntary intoxication, then unconsciousness is a defense only to specific intent crimes.

The question remains what constitutes unconsciousness for purposes of this defense? Does it matter whether the state of unconsciousness is induced by a physical, or medical condition, or by a mental illness known generally in the law as "unsound mind?" We turn to this more vexing question.

## B. Evolving Law on the Defense of Unconsciousness Caused by Mental Unsoundness

"To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.'. . ." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417 (*Halvorsen*), quoting *Newton, supra* 8 Cal.App.3d at p. 376.) The law is clear that in cases of unconsciousness caused by blackouts, involuntary intoxication, sleepwalking, or even epilepsy, an instruction is warranted where there is substantial evidence. (See *People v. Sedeno* (1974) 10 Cal.3d 703, 717, overruled on other grounds

in *People v. Breverman* (1998) 19 Cal.4th 142 ["An unconscious act within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional."]; *People v. Freeman* (1943) 61 Cal.App.2d 110, 118 [jury instruction required where the defendant's unconsciousness was due to epilepsy]; *Cruz*, *supra*, 83 Cal.App.3d at p. 330 [unconsciousness instruction should be given where there is evidence of involuntary intoxication].)

But where unconsciousness stems from a mental illness or "unsound mind," what evidence is relevant to an unconsciousness defense has evolved in California case law over the last century, much like the evolution in the fields of psychology and mental illnesses themselves. For the first half of the 20th century, cases limited a defense of unconsciousness to individuals of "sound mind" relying on the theory that the defenses of insanity and unconsciousness were mutually exclusive. (*People v. Methever* (1901) 132 Cal. 326, 329 (*Methever*), disapproved on other grounds in *People v. Gorshen* (1959) 51 Cal.2d 716, 731-734); *Hardy*, *supra*, 33 Cal.2d 52.) In 1901, when our Supreme Court considered the issue in *Methever*, section 26 stated in part: "All persons are capable of committing crimes except those belonging to the following classes: . . . [¶] 2. Idiots; [¶] 3. Lunatics and insane persons; . . . [¶] 5. Persons who committed the act charged without being conscious thereof." (*Methever*, at p. 329.) The court held that consciousness "does not contemplate cases of unsound mind,—that is, cases of idiots, lunatics, and insane persons,—but, upon the contrary, contemplates only cases of persons of sound mind,—as, for example, somnambulists, or persons suffering with delirium from fever or drugs." (*Ibid.*) The court reasoned that unconsciousness should not be given a "broader construction" to include people with unsound minds because those individuals, which included idiots, lunatics, and insane persons, were identified separately in section 26 from " '[p]ersons who committed the act charged without being conscious thereof.' " In the case of lunatics, idiots, and insane persons, their defense was limited to not guilty by reason of insanity. (*Ibid.*)

11

In *Hardy*, decided almost 50 years after *Methever*, the Supreme Court had occasion to consider the defense of unconsciousness raised in "mitigation" of a murder charge. The defendant claimed that the trial court erred in requiring him to overcome the presumption of consciousness by producing a preponderance of evidence that he was unconscious at the time the homicide was committed. (*Hardy*, *supra*, 33 Cal.2d at p. 64.) The court agreed that the defendant had the right to raise unconsciousness, not just in support of a plea of insanity, but also as a defense to the substantive crime itself. The court distinguished between the two, explaining that the burdens of proof were different. Nevertheless, the court went on to cite *Methever* with approval, noting that the law allowed persons of unsound mind to enter separate pleas of insanity, while those entitled to claim unconsciousness at the time of the crime were limited to persons of sound mind "who suffer from some force that leaves their acts without volition. [Citations.]" (*Id.* at p. 66.)

More recent California Supreme Court cases appear to approve the defense of unconsciousness based on mental illness or unsound mind, although the court has not expressly disapproved *Methever*. In *People v. Coogler*, the defendant was suffering from a disassociation reaction stemming from mental illness, likely schizophrenia, where he could not recall his actions in shooting several victims. (*People v. Coogler* (1969) 71 Cal.2d 153, 162.) A psychiatrist testified that during the disassociation reaction " 'there is an impairment of consciousness.' " (*Id.* at p. 163.) In evaluating the court's instruction on murder and manslaughter, the Supreme Court cited to section 26 and found that the "trial court, therefore, should have instructed the jury to acquit the defendant if it found that he killed while unconscious." (*Id.* at p. 170.)

The Supreme Court most recently addressed the issue of unconsciousness in *Halvorsen*, again without referencing *Methever*. The court upheld a refusal to instruct on unconsciousness because the evidence demonstrated that a defendant, who was suffering from a bipolar disorder with psychosis, was aware of his actions at the time of the crime. (*Halvorsen*, *supra*, 42 Cal.4th 379.) The defendant testified he did not consciously pull the trigger and had "gaps" in his memory. The expert testified that the defendant suffered

12

from bipolar disorder with symptoms of psychosis. The court held: "Defendant's own testimony makes clear that he did not lack awareness of his actions during the course of the offenses." (*Id.* at p. 418). The defendant's conduct was complicated and purposeful and included driving from place to place, aiming at his victims and shooting them in vital areas of the body. (*Ibid.*) Thus, it appears that the *Halvorsen* court at least tacitly allowed for the defense of unconsciousness in the case where the defendant was of "unsound mind," but rejected it because the record evidence in that case did not support the claim.

More recent intermediate appellate court opinions have concluded that the defense of unconsciousness can be based on an unsound mind, even where the evidence might be probative of either (or both) unconsciousness and insanity. (*People v. Lisnow* (1978) 88 Cal.App.3d Supp. 21, 24, 26 [evidence of unconsciousness due to defendant's "unsound mental condition" should not have been stricken]; *People v. Williams* (1971) 22 Cal.App.3d 34, 53-54 [jury should have been instructed on unconsciousness based on evidence of the defendant's "unsoundness of mind" due to a psychomotor epileptic attack]; *People v. Moore* (1970) 5 Cal.App.3d 486, 492 [expert testimony that the defendant was in a "schizophrenic fugue state" when he shot the victim and that his acts were " 'an automatic reaction without consideration;' as, 'in a dream without any thought' " warranted jury instruction].)

More directly, the Second District Court of Appeal has held that "the validity of *Hardy* and *Methever* has been eroded by subsequent decisions of our high court." (*People v. Kitt* (1978) 83 Cal.App.834, 845 (*Kitt*), citing *People v. Baker* (1954) 42 Cal.2d 550, 568 (*Baker*), overruled on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771.) In *Kitt*, the defendant argued that unsoundness of mind, even though not amounting to insanity, may still constitute a complete defense of unconsciousness. (*Kitt*, at p. 844.) *Kitt* cited to the Supreme Court's reasoning in *Baker*, which held the terms " ' "[s]ound mind" and "legal sanity" are not synonymous.' . . ." (*Kitt*, at p. 845, citing *Baker*, at p. 568.) Seemingly inconsistent with the conclusion in *Methever*, the *Baker* court highlighted that "[t]he distinction that these definitions draw between soundness of

mind and legal sanity is impliedly recognized in section 26 of the Penal Code, which provides that lunatics, idiots, and insane persons are not capable of committing crimes. It is expressly provided in section 21 of the Penal Code that idiots and lunatics are not of sound mind; yet, if soundness of mind and legal sanity are synonymous, the express provisions of section 26 exempting idiots and lunatics from criminal responsibility would be superfluous because they would necessarily be included within the provision exempting the insane." (*Baker*, at pp. 568-569.)

Our division addressed the issue in *People v. Caldwell* (1980) 102 Cal.App.3d 461, 477 (*Caldwell*), a case involving facts resembling our own. There, one of the defendants, Heide, suffered from posttraumatic epilepsy caused by a severe head injury. (*Id*. at p. 475.) Heide was also a heroin user, which exacerbated his epileptic seizures. (*Ibid.*) Heide's seizures made him capable of "automatic movements[] while in a state of unconsciousness." (*Ibid.*) The expert testified that Heide could have driven to the market, given orders, taken money, and fired a gun, all while in a state of unconsciousness. (*Ibid.*) A rebuttal witness testified that someone suffering from a psychomotor seizure could not engage in such purposeful and complicated actions. (*Ibid.*) The trial court instructed the jury using the pre-1979 CALJIC instruction which included language that the unconsciousness instruction only applied to individuals of "sound mind." (*Id*. at p. 476; former CALJIC No. 4.30.)

We concluded: "Older cases held that the unconsciousness category of Penal Code section 26 excludes persons of unsound mind, who are included in the insanity category," citing to *Methever* and *Hardy*. (*Caldwell*, *supra*, 102 Cal.App.3d at p. 477.) "*People v. Kitt* discerned a subsequent trend in the high court to view the terms 'sound mind' and 'legal sanity' as not being synonymous (see *People v. Baker*[, *supra*,] 42 Cal.2d [at p. 568] . . . ), and concluded that, at present, Penal Code section 26 is properly interpreted as allowing a person of unsound mind to rely on the defense of unconsciousness. ([*Kitt*, *supra*,] 83 Cal.App.3d at p. 845. See also *People v. Williams* (1971) 22 Cal.App.3d 34, 54-57 . . . .) CALJIC No. 4.30 (1979 revision) no longer limits the defense of unconsciousness to persons of sound mind." (*Caldwell*, at p. 477,

14

fn. omitted.)  While the trial court erred in giving the instruction that limited the defense of unconsciousness to individuals of sound mind, the *Caldwell* court concluded that the error was harmless because the jury found Heide guilty of first degree murder, thus rejecting the view Heide was suffering from any mental illness that reduced his mental capacity.  (*Id.* at pp. 477-478.)

Similarly, and most recently, the Fourth District, Division Three held in *People v. Gana* (2015) 236 Cal.App.4th 598, that the trial court erred in failing to instruct the jury on the defense of unconsciousness.  In that case, the defense presented expert medical testimony "who identified the medications defendant was taking to combat cancer and to overcome the adverse effects of the chemotherapy, and explained how these medications could affect her mental state.  In particular, [a defense expert] concluded defendant was suffering from a psychosis likely caused by 'a combination of events, combination of factors, including both her depression as well as the medications that she was taking.  It appears that she was experiencing a delirium, which is a kind of fluctuating level of consciousness, due to medical illness that caused her to . . . have worsening symptoms of depression and worsening psychoses.' "  (*Id*. at p. 610.)  However, a divided panel went on to also conclude that the error was harmless.  (*Id*. at p. 615, conc. & dis. opn. by Moore, J.)

As we did in *Caldwell*, and consistent with the aforementioned recent opinions, we hold here that appellant was entitled to an instruction on unconsciousness.  While our Supreme Court has not yet directly repudiated its more than century-old decision in *Methever*, we agree with those courts who have viewed more modern pronouncements by our high court as a tacit rejection of the continued dichotomy between unconscious states resulting from physical or organic conditions and those resulting from severe mental illnesses.  One who is unaware of his or her actions because of the lack of volitional capacity does not commit an act with either specific or general criminal intent, as those terms are understood in criminal law.  A state of unconsciousness from whatever cause at the time of committing an alleged crime vitiates both specific and general criminal intents.  Thus, we hold that the complete defense of unconsciousness under section 26

15

applies regardless of whether the actor's mental state of unconsciousness is induced by "unsound mind," including that caused by mental illness, and not just to those who are rendered unconscious by physical or organic conditions.

Not only do we conclude it was error to refuse appellant's request to give CALJIC No. 3425 on the defense of unconsciousness, but we also conclude appellant was prejudiced by that error. There was ample evidence before the jury that appellant was unaware of his actions and acted in an unconscious state.[4] It was reported to police that appellant was attempting to climb the exterior of the building. Both the victim and the responding officer testified that appellant was running around the parking lot "crashing his head into cars and garbage cans." Officer Ko testified that during the entire incident and arrest, appellant was never responsive to his commands, and was mumbling incoherently. Dr. Griffith testified that appellant had suffered from a seizure disorder since age 17 and was experiencing a severe psychotic episode on February 19. Appellant "did not have awareness of what took place" during the incident.

The fact that there is contrary evidence demonstrating appellant exhibited some awareness by telling the officer to "tase him" and telling the victim to "kiss him" does not eliminate the requirement for the court to provide the instruction. (*Burns*, *supra*, 88 Cal.App.2d at p. 871.) It is properly left to the jury to weigh the evidence and determine if appellant was unconscious.[5]

---

[4] While the parties discuss prejudice, neither side addresses whether the refusal to give CALCRIM No. 3425 is judged by the harmless beyond a reasonable doubt standard under *Chapman v. California* (1967) 386 U.S. 18, or the "reasonable probability" standard under *People v. Watson* (1956) 46 Cal.2d 818, 836. We need not address this subsidiary question as we find prejudice no matter what standard is applied.

[5] Because we conclude it was prejudicial error to refuse the defense request to instruct the jury on the defense of unconsciousness based on appellant's unsoundness of mind, we need not, and do not, address appellant's alternative argument that it was error to refuse the instruction solely based on his failure to recall the events at the senior housing complex. (See *People v. Wilson* (1967) 66 Cal.2d 749, 756; *People v. Bridgehouse* (1956) 47 Cal.2d 406, abrogated on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101.)

16

Also, while there was some evidence that appellant's condition on February 19 may have been induced by the voluntary use of drugs, the evidence was far from conclusive on this point, as noted above. Indeed, it appears the jury considered and rejected the notion that appellant's mental state was the product of drug use when it found him not guilty by reason of insanity, based on the testimony of Dr. Griffith, and after making a specific inquiry about appellant's prior drug use. In this regard, we refer again to the later bifurcated trial during which the jury was instructed with CALJIC No. 3450. That instruction, in part, included the admonition that "a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity." If the jury had concluded that appellant's mental state at the time of the February 19 event was the product of his own voluntary intoxication, it necessarily was required to reject his defense of not guilty by reason of insanity; its contrary finding clearly implies that the jury was not so convinced.

## C. The Court Did Not Improperly Admit Evidence of Appellant's Sanity at the Guilt Phase

Respondent argues that the court did not err in refusing to give an unconsciousness instruction because the evidence of appellant's mental state should not have been allowed at the guilt phase of the trial, and was only relevant at the sanity phase. Respondent is correct that evidence of appellant's mental state may not be admitted to prove insanity at the guilt phase. (*People v. Elmore* (2014) 59 Cal.4th 121, 141.) But, this argument fails here for several reasons.

First, there was no objection to Dr. Griffith's testimony at trial. Prior to trial, the prosecution requested a hearing under Evidence Code section 402 about whether the psychiatric testimony was admissible during the guilt phase and the court stated that it would address the issue "if it comes up." The issue was never raised again and the prosecutor lodged no objection to Dr. Griffith's testimony that appellant suffered a psychotic episode and was unaware of his actions.

Second, this testimony was directed at the issues of specific intent and consciousness, rather than sanity. Appellant was charged with aggravated mayhem

17

which required the prosecution to prove a specific intent to cause a permanent disability or disfigurement.  (§ 205; *People v. Assad* (2010) 189 Cal.App.4th 187 [evidence of an indiscriminate attack is not sufficient for aggravated mayhem].)  While the trial court rejected appellant's defense of unconsciousness, the psychological testimony was admitted on the issue of whether appellant could form the specific intent required for aggravated mayhem.  The court instructed the jury that the evidence appellant suffered from a mental disease, defect or disorder could only be considered for the "limited purpose" of "deciding whether the defendant acted with the specific intent required for the crime of aggravated mayhem."  It may be true that Dr. Griffith's testimony supported a finding of insanity, but at the guilt phase, it was not admitted to prove insanity.  (See *People v. Hernandez* (2000) 22 Cal.4th 512, 520 ["Although guilt and sanity are separate issues, the evidence as to each may be overlapping.  Thus, at the guilt phase, a defendant may present evidence to show that he or she lacked the mental state required to commit the charged crime.  [Citations.]  A finding of such mental state does not foreclose a finding of insanity."].)

We disagree with respondent's characterization that the admission of Dr. Griffith's testimony during the guilt phase improperly gave appellant "two bites at the proverbial apple."  Not only was there a failure to object when that testimony was proffered, but even under the trial court's unjustifiably restrictive view of the defense of unconsciousness, the evidence was appropriately admitted to disprove the specific intent for aggravated mayhem.

In any case, that testimony was relevant to appellant's defense of unconsciousness and admissible for that reason.  It was only through the failure of the trial court to instruct on the that defense that prejudicial error resulted.

## D.  Unconsciousness Caused by Voluntary Intoxication Is Not a Defense to a General Intent Crime, and May Be Raised in Any Potential Retrial Upon Remand

The law is clear that a person cannot be held responsible for actions taken while unconscious, but a defendant can be held responsible, under some circumstances, for inducing that state by the voluntary use of drugs or intoxicants.  " 'It is a duty which

18

every one owes to his fellow-men, and to society . . . to preserve, so far as lies in his power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable. But if, by a voluntary act, he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which, in that state, he may do to others or to society.' . . ." (*Velez*, *supra*, 175 Cal.App.3d at p. 794, citing *People v. Blake* (1884) 65 Cal. 275, 277, quoting *People v. Rogers* (1858) 18 N.Y. 9.)

Thus, as we have noted earlier in this opinion, unconsciousness caused by voluntary intoxication provides no defense to a general intent crime. (*Kelly*, *supra*, 10 Cal.3d at p. 573.) It is only a partial defense to a criminal charge—that is, it may serve to negate specific intent. (*Ibid.*) As summarized earlier in this opinion, there was evidence presented from which the jury could have concluded that appellant's use of illegal drugs caused his state of unconsciousness. While Dr. Griffith was of the ultimate opinion was that appellant's mental state on February 19 was most probably the result of a severe or bizarre psychotic episode, and not from a substance-induced psychosis, he testified that appellant could have been suffering a substance-induced psychotic disorder from either legal or illegal drug use. Dr. Griffith noted that appellant was a regular user of cocaine and marijuana and also used methamphetamine, acid, mushrooms, and ecstasy. He testified that appellant's mother told him she smelled marijuana at the apartment on the day of the incident. A female witness reported that appellant had tried to put pills into her boyfriend's mouth. There was, however, no toxicology screening done at the hospital after the incident.

In light of this evidence, in the event of a retrial of the crimes of simple mayhem and assault, should the evidence upon retrial once again support the complete defense of unconsciousness as that defense is elucidated by this opinion, the issue of voluntary

19

intoxication may also be raised as an exception to that defense, and both may be presented to the jury to decide, consistent with CALJIC No. 3425.**6**

## IV.

## DISPOSITION

The convictions for mayhem and assault are reversed, as is the resultant judgment. The matter is remanded to the trial court for further proceedings consistent with this opinion.

---

**6** We note, too, for the guidance of the trial court that our reversal of the judgment necessarily requires the retrial of appellant's insanity defense should that plea be reentered upon remand, and if appellant ultimately is found guilty following the retrial of the guilt phase. "Trying the issue of alleged insanity of a person who is charged with a crime is not a separate trial, but merely a separate determination of one of the issues of the original charge. (*People v. Foster* (1934) 3 Cal.App.2d 35, 39. . . ; see also *People v. Phillips* (1979) 90 Cal.App.3d 356, 362–363. . . .) In the eyes of the law there is only one trial even though it is divided into two sections or stages if insanity is pleaded as a defense. (*People v. Wells* [(1949)] 33 Cal.2d 330, 349[, superseded by statute on other grounds as stated in *People v. Saille* (1991) 54 Cal.3d 1103].)" (*People v. Villarreal* (1985) 167 Cal.App.3d 450, 458.)

_____

RUVOLO, P. J.


We concur:


_____

REARDON, J.


_____

STREETER, J.

A139463, *People v. James*

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Jon R. Rolefson |
| Counsel for Appellant: | Walter K. Pyle, by appointment of the Court of Appeal under the First District Appellate Project's Independent Case System |
| Counsel for Respondent: | Kamala D. Harris Attorney General of California |
| | Gerald A. Engler Chief Assistant Attorney General |
| | Seth K. Schalit Supervising Deputy Attorney General |
| | Elizabeth W. Hereford Deputy Attorney General |

A139463, *People v. James*