Filed 5/19/21  P. v. Schuneman CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAN JAMES SCHUNEMAN,<br><br>    Defendant and Appellant. | G058170<br><br>(Super. Ct. No. 17NF1808)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed as modified.

Dawn S. Mortazavi, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Appellant was convicted by a jury on seven criminal counts stemming from a confrontation with officers from the La Habra Police Department (LHPD) in front of his RV, which was parked in a retail parking lot. After he made a belligerent, somewhat incoherent 911 call, officers found the RV and tried to follow up with appellant. He responded by advancing on them with an axe. When he failed to heed their commands to drop his weapon and instead continued to advance, officers deployed various weapons to subdue him and took him into custody. Appellant contends he lacked the present ability to commit assault given his distance from the officers. He further contends the trial court should have instructed the jury on an unconsciousness defense. We reject these arguments. However, pursuant to our power under Penal Code section 1260,[1] we modify the abstract of judgment to reflect stays ordered by the trial court in the sentences it imposed on several of the counts. As so modified, we affirm.

## FACTS

On July 4, 2017, Officer Justin Bender of LHPD was dispatched to the area of Imperial Highway and Beach Boulevard to follow up with a subject in a motor home who had called in making aggressive and accusatory statements about law enforcement. [2] Officer Bender was advised the subject had threatened the dispatcher and police in general. He came upon appellant's motor home in a retail parking lot. Given the threatening nature of the calls, he awaited backup before approaching it.

Next to arrive was Corporal John Jaime. From outside the RV, there seemed to be audible commotion going on inside it. This commotion, coupled with the threatening call to dispatch, prompted Corporal Jaime to call for additional backup officers in order to approach appellant. As the backup officers – including officers

---

[1]    All further statutory references are to the Penal Code.
[2]    We do not have the audio recording of the call in our record, but we do have the transcript. The caller seemed to have an irrational belief that police were threatening him or stealing from him.

2

Coleman, Telles, Castanon, and Cassidy; and Corporal Hentcy – arrived, Corporal Jaime arranged a game plan. Officer Bender was to carry a solid, non-riot shield and take the lead in communicating with appellant.[3] Officer Telles carried a .40 millimeter weapon containing a less-lethal sponge round, and would follow behind Officer Bender. Officer Castanon would have a taser, and Officer Coleman was to provide lethal coverage, and would carry handcuffs if contact with appellant was necessary. The four officers approached in a single-file, "stack" formation as Officer Bender began rapping on the rear passenger side of the RV and announcing police presence.[4]

Appellant emerged at least partially, but he seemed to stumble coming down the RV's steps before he was able to fully alight. He was carrying a two- or three-foot axe.[5] Officer Bender testified appellant was holding the axe down on the right side of his body upon emerging, but then he began "swaying" it at his side and walking toward the officers. The officers immediately began yelling at appellant to drop the weapon. He could be heard saying words to the effect of: "Get the fuck out of here. I did nothing wrong."

He held the axe firmly in his right hand, upright, around shoulder- or head-high, with the blade facing the officers. As he advanced in "a deliberate walk" toward them, the officers fanned out into a shoulder-to-shoulder position. This would allow them to get a better view of what he was doing with the axe.

---

[3]  Corporal Jaime testified the shield was made of opaque rather than clear material, had ballistic protection, and was about two or three feet in length.

[4]  Officer Bender testified he said: "Dan, you are not in trouble. We are here to do a welfare check. Come out and have a conversation with us."

[5]  Some of the testimony indicated appellant only got the axe after he first saw the officers. Officers Telles and Cassidy testified appellant was not carrying the axe when he first emerged from the RV, but turned and retrieved it after spying the officers. Officer Castanon testified that appellant got out, reached back in, and got the axe. Corporal Jaime's testimony suggested appellant was retrieving the axe as he was falling down the RV steps. No one disputes that he had an axe.

Appellant was still holding the axe upright with blade facing the officers when he reached about 10 to 15 feet from their position.[6]  He did not attempt to swing or throw the axe, but he was not obeying repeated commands to drop it and was still holding it firmly.  The officers at this point were in fear of what appellant might do with the axe, so Corporal Hentcy urged Officer Telles to fire a sponge round at appellant.

Appellant stopped after getting hit and seemed to double over a bit, but never let go of the axe.  While he was stopped, Officer Cassidy, who had arrived after the other officers, and was positioned to the side of the confrontation, began running toward appellant to deploy his taser but could not subdue appellant with it.

Corporal Jaime was in fear for Officer Cassidy's safety.  When he saw appellant make a forward motion, as if he were going to take another step toward the officers, he fired a round from his handgun, aiming for appellant's torso.  The officers felt appellant was close enough to strike them or throw the axe at them.

Appellant went down.  Once he was on the ground, officers discovered a knife in his waistband.  He was arrested and ultimately charged with four counts of aggravated assault on a peace officer (as to Corporal Jaime, and Officers Bender, Castanon, and Telles) (§ 245, subd. (c)), and three counts of resisting a peace officer (as to Corporal Jaime, and Officers Cassidy and Coleman) (§ 69).

At trial, appellant presented evidence of impairment in his mental state.  The impairment came in three forms.

First, appellant had suffered from mental illness since adolescence, including panic attacks.  Later on in life, he had become addicted to pain medication, which required treatment.  He presented expert testimony from psychologist Veronica Thomas, who had determined he had alcohol use disorder as well as bipolar disorder with psychotic features.  Because of his bipolar disorder, he demonstrated paranoia about

---

[6]     The testimony varied regarding how close appellant came to the officers' position, but the range we can ascertain from the officers' testimony was 10 to 25 feet.

4

others' treatment of him which had no basis in reality. It appeared from her discussions with his mother that appellant had been having such delusions for years. Having listened to the audio recording of the 911 call, Dr. Thomas indicated it could potentially reflect psychosis, or a state in which appellant's brain was unable to organize information and accept help from the operator. But she was not asked to render an expert opinion as to whether appellant was indeed experiencing a psychotic episode during the 911 call.

Second, appellant had recently been under a lot of stress. His wife was divorcing him, which necessitated his living in the RV, away from his two young children. He was having disputes with his business partners and was "falling behind in everything."

Finally, he had been exposed to chemicals in the RV. Although he admitted it was his voice in the audio recordings of the 911 call, he claimed to have no recollection of making the call. He blamed his lack of recollection on being "intoxicated," not from alcohol, but from exposure to lacquer thinner he accidentally spilled, and a carbon monoxide leak in the RV.[7]

Appellant testified in his own defense. He meandered a bit but demonstrated quick recall of the confrontation. He had spilled the lacquer thinner in the evening, and it was the last thing he remembered doing that day. He fell asleep in his clothes, clutching his children's photographs. When he awoke, he began working on some wiring in the RV. He did not recall making any call to 911 during this time. He was still working on the wiring when he heard "chatter" outside. He went to see what it was.

He took his axe and started to emerge from the side of the RV, but the stairs did not completely unfold and he slid a bit. He claimed he always had the axe with him

---

[7] It is unclear from the record exactly when the 911 call took place, but it seems reasonably clear it was on the Fourth of July. During discussion about jury instructions, both defense counsel and the trial judge noted there had not been any evidence of when the 911 call took place, but the inference was LHPD officers were dispatched in response to the call, and Officer Bender had testified as such.

because it was a tool he commonly used while working on the vehicle. He admits he was holding the axe upright near his right ear with his right fist just below the blade. When he got out, he could not see anyone until he caught a glimpse of Officer Bender's shield, which he initially mistook for a motorcycle. But he did not see the officers themselves until he took another step or two and saw them peeking around the back of the RV. They then went shoulder-to-shoulder so he could fully see there were several of them. Appellant calculated he had not stepped more than two feet toward the officers when he was shot.

He acknowledged the police were yelling at him not to move, but he was slightly frozen and was worried he would get shot. He was telling them not to shoot him. But when he tried to put the axe down, he felt himself get shot and sunk to one knee. He remembered being handcuffed.

The jury deliberated for a little over two hours before reaching guilty verdicts on all seven charges. The trial court sentenced appellant to 14 years and four months in prison: eight years on count one, 16 months on count five, and five years because of a prior conviction. The court imposed eight-year sentences each for counts two, three, and four, and four-year sentences each for counts six and seven, to run concurrently with the sentence for count one. The sentences for these counts were stayed pursuant to section 654, with the stays to become permanent upon completion of the sentence for count one.

## DISCUSSION

Appellant seeks reversal of the conviction on counts one through four on two grounds: (1) insufficiency of the evidence to show a present ability to commit assault under section 245, subdivision (c) and (2) the trial court's failure to instruct on an unconsciousness defense. We find both grounds lacking.

6

## I. Present Ability to Commit Assault

"'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]

"'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' (*People v. Jones* (1990) 51 Cal.3d 294, 314.)" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) With this in mind, we turn to the applicable law.

"To establish a violation of section 245, subdivision (c), among the elements that must be proven are those of assault." (*People v. Nguyen* (2017) 12 Cal.App.5th 44, 48 (*Nguyen*).) "'An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' (§ 240.) A defendant has the ""present ability to injure"" "'[o]nce [he] has attained the means and location to strike immediately.'" (*People v. Chance* (2008) 44 Cal.4th 1164, 1174 (*Chance*).) In this context, immediacy means that the defendant has 'equip[ped] and position[ed] himself to carry out a battery . . ., even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury.' (*Id.* at p. 1172.) Thus, an assault can occur even when the defendant makes no contact with the victim. [Citation.]" (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 85 (*Raymundo M.*).)

7

The present ability element of assault exists to "insure the defendant has reached the point where he is able to strike immediately at his intended victim," as the term "immediately" is understood in this context. Therefore, "[t]he fact an intended victim takes effective steps to avoid injury has never been held to negate" it. (*People v. Valdez* (1985) 175 Cal.App.3d 103, 113.)

Appellant contends he did not have the means or location to accomplish an injury. Based on the testimony taken at trial, he was anywhere between 15 and 40 feet away from the officers at the time he was shot. He claims he could not have completed the assault from such a distance. This is his "location" argument. In addition, he thinks his axe was not in a readied position, describing it as "down to his side and not ready to injure the police." This is his "means" argument.

Appellant's own record citations do not support his means argument. Officer Cassidy testified appellant may have briefly brought the axe down before bringing it "relatively up in the same position" as it was before – meaning upright. Corporal Hentcy said he urged Officer Telles to fire a sponge round at appellant because he was walking deliberately with the axe "raised over his head," and the officers were in "imminent danger of being harmed." None of this testimony supports the suggestion for which appellant cites it – that he was not pointing his axe at police, but instead carrying it by his side.

Officer Bender testified appellant was "swaying" the axe at his side when he began his approach, and he could not see whether appellant ever raised it above his waistband. But appellant himself said he held the axe upright after shifting it from his left hand to his right. And the testimony is pretty clear he held it upright as well. There was ample evidence for the jury to conclude appellant was indeed holding the axe upright when he was facing the officers. He had the means to immediately strike at them by throwing or swinging the axe.

8

The jury also had sufficient evidence to conclude appellant was in a suitable location to strike. The officers in the direct line of attack all testified appellant was in the range of 10 to 20 feet away from them when Officer Telles and Officer Cassidy (and then Corporal Jaime) moved to neutralize the threat he posed. The only officer who recalled a slightly larger distance of 20 to 25 feet – Officer Cassidy – was positioned to the side of the group with a different vantage point. An eyewitness watching from a nearby store window testified that he thought it looked much closer – like a distance of two or three feet – from his vantage point.

Appellant alone testified he walked only a few feet in the officers' direction, to a distance of about 30 to 40 feet away, before he was shot. The jury was free to adopt the estimates of the police officers or the independent witness over appellant's and conclude appellant was within striking distance. An axe is a weapon that can inflict injury both at close range or long range. At close range, it can be swung at the victim, and at long range, it may be thrown. We cannot reweigh the evidence and say the jury's conclusion about the appellant's ability to inflict injury from his location was erroneous.

Appellant seeks to distinguish *Nguyen* and *People v. Yslas* (1865) 27 Cal. 630 (*Yslas*), two cases which support his conviction, but he is unsuccessful.

In *Yslas*, the defendant raised a hatchet at the victim inside her home and advanced to a seven- or eight-foot distance from her. (*Yslas, supra,* 27 Cal. at p. 631.) The victim ran into another room and closed the door, which defendant began hitting with his hatchet. (*Ibid.*) She left the other room through a separate door and escaped the building. (*Ibid.*) The California Supreme Court held the trial court properly declined to instruct the jury that the defendant had no present ability to harm the victim because she had left the area. (*Ibid.*) It observed "the true ingredients of the common law and of the statutory assault" are "apparent though not . . . actual power, not necessarily within striking distance, but so near as to put a man of ordinary firmness not in actual but in well-founded apprehension of peril." (*Ibid.*) As such, it should not matter whether the

9

victim prevented the defendant from completing the attack – in that case, by escaping, in this by stopping his advance.

In *Nguyen*, we confronted the question of whether a 10- to 15-foot distance was, as a matter of law, insufficient to support present ability to commit aggravated assault with a 12- to 15-inch knife. (*Nguyen*, *supra*, 12 Cal.App.5th at p. 48.) Citing *Chance*, *Yslas*, and other precedents, we refused to establish such a rule, finding it was the province of the trier of fact to determine what distance was sufficient to constitute a present ability to commit assault.[8] (*Nguyen*, *supra*, 12 Cal.App.5th at pp. 48-49.)

Both *Yslas* and *Nguyen* support affirmance here. Whether appellant was two, 10, 15, 20, or 25 feet away, his forward progress was halted by the actions of the officers, who reasonably perceived he could or would inflict harm on them with the axe if they did not expeditiously act.[9] Pursuant to *Yslas*, appellant gains no absolution because the officers employed preventative measures. And consonant with *Nguyen*, we defer to the jury's determination of the distance sufficient to meet the present ability element, so long as it is supported by substantial evidence. It is.

## II.        Failure to Instruct on Unconsciousness

Appellant's counsel asked the trial court for an involuntary intoxication instruction under CALCRIM No. 3427 based on appellant's testimony about having inhaled fumes.[10] The trial court concluded the bench notes for CALCRIM No. 3427 did

---

[8]        Last year in *Raymundo M.*, our sister division agreed with our analysis in *Nguyen*. (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 89.) There, the defendant contended the 10- to 12-foot distance separating him from his victim while holding a switchblade above his head was insufficient to constitute a present ability to inflict harm. The appellate court rejected the argument, saying: "The 10- to 12-foot distance at issue here is within a range the trier of fact could reasonably conclude posed a danger of imminent bodily harm to I.S., absent evasive action." (*Ibid*.) The same principle applies here.

[9]        Appellant says *People v. Williams* (2001) 26 Cal.4th 779 (*Williams*) requires the assaulter to be one movement away from completing the battery. We note *Williams* focused on clarifying the mental state required for assault; the high court was not construing the present ability element of assault. Even so, its language suggested immediacy is to be judged from the perspective of a reasonable victim. (*Id.* at p. 786 ["An assault occurs whenever "'[t]he next movement would, *at least to all appearance*, complete the battery.'" [Citation.].") We see nothing in that analysis to contradict our own.

[10]        CALCRIM No. 3427 states: "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/ [or] mental state) when (he/she) acted.

not require it to give the instruction sua sponte unless the intoxication resulted in unconsciousness. Hence, counsel requested the unconsciousness instruction (CALCRIM No. 3425) be given as well, and the trial court declined.[11] It did not think there was sufficient evidence of unconsciousness. In fact, it did not even want to give the involuntary intoxication instruction, but felt it had to allow the jury to assess such a possibility when considering the specific intent crimes.

Appellant takes issue with this decision. He believes there was sufficient evidence to give the unconsciousness instruction, and the failure to do so prejudicially violated his federal constitutional right to present a defense. We do not believe the trial court erred so we need not reach the latter issue.

### A.        Unconsciousness Defense

". . . [U]nconsciousness is a complete defense except where it is caused by voluntary intoxication." (*People v. Heffington* (1973) 32 Cal.App.3d 1, 8 (*Heffington*); see also § 26.) As the term is used in this context, "unconsciousness" "need not reach the physical dimensions commonly associated with the term (coma, inertia, incapability of locomotion or manual action, and so on); it can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting." (*People v. Newton* (1970) 8 Cal.App.3d 359, 376 (*Newton*); see also *People v. Hughes* (2002) 27 Cal.4th 287, 344.) The defense can be raised by the defendant's own lack of recollection of the criminal act. (*Newton*, *supra*, 8 Cal.App.3d at p. 376.) However, a defendant's simple failure to recall

---

"A person is *involuntarily intoxicated* if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the (force/[, [or] duress/, [or] fraud/, [or] trickery of someone else), for whatever purpose [, without any fault on the part of the intoxicated person]."

11        CALCRIM No. 3425 states: "The defendant is not guilty of <insert crime[s]> if (he/she) acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]

"Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] <insert a similar condition>).

"[The defense of unconsciousness may not be based on voluntary intoxication.]

"The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious, unless based on all the evidence, you have a reasonable doubt that (he/she) was conscious, in which case you must find (him/her) not guilty."

certain details of the events is insufficient to raise the defense. (See *People v. Halvorsen*, 42 Cal.4th 379, 418 (*Halvorsen*).) "In the sense intended by . . . section 26 . . ., unconsciousness includes not only a state of coma or immobility, but also a condition in which the subject acts without awareness." (*Heffington*, *supra*, 32 Cal.App.3d at p. 9.)

### B. Sufficiency of the Evidence to Give the Instruction

A trial court's duty to instruct on an affirmative defense is contingent on the presence of evidence supporting the defense which would be sufficient to a raise a reasonable doubt in the jury's mind, so long as the defense is not "inconsistent with the defendant's theory of the case." (See *People v. Salas* (2006) 37 Cal.4th 967, 982.) Here, the trial court properly refused the instruction because there was insufficient evidence before the jury to indicate appellant was acting without awareness.

Appellant claims his testimony about having inhaled lacquer thinner and carbon monoxide fumes, and Dr. Thomas' testimony as to his mental condition, constituted sufficient evidence to raise the defense. We disagree.

Appellant testified he spilled lacquer thinner and felt like he was drunk, and this was a likely culprit for his behavior on the 911 call. He said he had experienced the effects of the lacquer thinner in previous situations and described it as making him "very red and flushed," with the capacity to "get really angry." While he had a carbon monoxide leak from a generator he was working on, he mostly attributed his behavior on the 911 call to the lacquer thinner.

This testimony may have been sufficient to support an involuntary intoxication instruction (which the trial court did give as to counts five through seven), because such was the effect he described – being "angry" and "flushed." But being angry and flushed does not constitute a lack of awareness. And, as the trial court noted, there was no expert testimony to identify the chemicals in the lacquer thinner or their potential effect on the human body. Without more, the mere suggestion appellant may have

12

become intoxicated by the lacquer thinner fumes did not support an unconsciousness instruction.

This leaves Dr. Thomas' testimony. Mental illness can be the foundation for an unconsciousness defense. (See *People v. James* (2015) 238 Cal.App.4th 794, 809 (*James*).) However, the essential element of unconsciousness remains – the person must be unaware of his actions. (See *Halvorsen*, *supra*, 42 Cal.4th at p. 417.)

This was the case in *James*, one of the main cases on which appellant relies. The defendant in *James* was acting in a bizarre manner: trying to climb the side of a residential building and running around and "'crashing his head into cars and garbage cans'" in the parking lot. (*James, supra,* 238 Cal.App.4th at p. 809.) He did not obey police instructions and mumbled incoherently. (*Id*. at p. 810.) The only evidence of awareness was his saying "Tase" me to the police officer and "Kiss me" to a bystander whom he attacked. (*Id.* at pp. 809-810.) There was evidence that the defendant had a seizure disorder and post-traumatic stress due to head trauma; and he also used a lot of drugs, both legal and illegal. (*Id*. at pp. 798, 801.) He had an expert witness who testified that, in his opinion, the defendant was experiencing a "severe psychotic episode" on the date of the crime and was not aware of his actions. (*Id.* at pp. 801, 810.)

There was also evidence of unawareness in *People v. Gana* (2015) 236 Cal.App.4th 598 (*Gana*). The defendant in *Gana* attempted a murder-suicide of her family, killing her husband and wounding her son. (*Id*. at p. 603.) Defense medical experts testified about her receiving chemotherapy in the weeks prior and taking Ambien to help her sleep – and that these drugs could potentially cause psychosis. (*Id*. at pp. 603-604.) She was also suicidal and had come up with a plan to carry out the murder-suicide. (*Id.* at p. 603.) A defense expert testified she was suffering from a psychotic depression on the day of the crime, describing it as a "'delirium, which is a kind of fluctuating level of consciousness, due to medical illness that caused her to . . . have worsening symptoms of depression and worsening psychoses.'" (*Id*. at p. 604.) The defendant had a limited

13

recall at trial regarding the events. She could remember some of the events of the day and feeling "sad, depressed, tired" and not normal. (*Ibid*.) She remembered getting the gun and seeing the bullets, but she could not remember loading the weapon or aiming and firing it. (*Ibid*.)

The common thread in both *Gana* and *James* which is not present here is evidence of the defendant's unawareness of his or her actions while carrying out the crime. In each case, the defendants had experts who opined they were in a state of psychosis at the time of the crimes. Gana could not recall aiming or shooting the gun, and the defendant in *James* was acting in a bizarre manner and not responding to commands.

Dr. Thomas, in contrast, did not render an opinion as to whether appellant was in a psychotic state at the time of the confrontation with police. At best, her testimony was appellant *could have been* psychotic when he made the 911 call. When she was asked by defense counsel whether the call reflected someone going through a psychotic episode, Dr. Thomas clarified she felt the caller sounded like his brain was "completely unable to organize data properly, and if you want to call that a psychotic episode, that's certainly one way to describe it." But on cross-examination, Dr. Thomas seemed to concede that even a person experiencing a psychotic episode could still be aware of what was happening, as demonstrated in the below exchange:

"Q        And you would agree with me that even during a psychotic episode, someone can still understand that they're talking to a police officer, for instance?

"A        I don't know. I think it depends on every individual.

"Q        Okay.

"A        It's difficult. I can't give you that answer.

"Q        Okay. What if hypothetically that individual tells you after the fact, during this extreme psychotic episode, I knew I was talking to a police officer?

"A        Yes.

14

"Q          That would lend to your opinion that they're still aware of who they're having some interaction with.

"A          Sure.  There's an awareness because he called 911 and the people on the end of the line are going to be police officers.  So I would assume that he made that gesture for a reason.  But the thought process and how it worked is – is unknown – unknowable.

"Q          You can still have paranoid delusions that people are out to get you, but you could still relate to individuals in some sort of normal fashion?

"A          Some people can, yes."

Also, Dr. Thomas' testimony did not establish appellant's unawareness of his actions *at the time of the assault*.  As we have already noted, it was never clearly pinpointed when the 911 call occurred in relation to the confrontation with police, although it was *assumed* the confrontation was shortly after.  Because there was no clear timeline of events, the tie between appellant's state of awareness during the call and his state of awareness during the confrontation is more speculative.

Most importantly, as the Attorney General points out, appellant displayed a clear recollection of the events, though it differed from the version told by the officers.  He remembered going to sleep in the bedroom and waking up the next day, starting work.  He remembered hearing chatter outside the RV, and thinking it was people from the nearby Auto Zone store.  He recalled stumbling down the steps because the steps did not properly deploy.  He recalled carrying the axe upright near his head, walking forward, seeing Officer Bender's shield and then the other officers.  While appellant failed to respond to the officer's commands, he remembered hearing them shouting at him to put his hands up and not move.  He recognized them as cops and told them not to shoot him.  He claimed he was trying to put the axe down when they shot him.  His testimony demonstrated an awareness of what he did.  Far from being required, an unconsciousness instruction was contraindicated.

**III.**     **Abstract of Judgment**

The abstract of judgment filed in appellant's case fails to note the stays imposed by the trial court on the sentences for counts two, three, four, six, and seven pursuant to section 654. Appellant and respondent agree the error should be corrected, and we do as well. The stay was explicitly ordered on the record and the abstract should reflect it.

**DISPOSITION**

The abstract of judgment is modified to reflect section 654 stays on the sentences for counts two, three, four, six, and seven. As so modified, the judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:


ARONSON, J.


GOETHALS, J.