Filed 8/27/24  P. v. Ugarte CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ELMER UGARTE,<br><br>    Defendant and Appellant. | A167452<br><br><br>(Alameda County<br> Super. Ct. No. 21CR008570) |

Elmer Ugarte appeals his jury conviction for second degree murder of his wife, Maria Hernandez.  (Pen. Code, § 187, subd. (a).)[1]  He argues the trial court prejudicially erred by failing to instruct the jury on the lesser included offense of involuntary manslaughter based on unconsciousness from voluntary intoxication.  We find no error.  We, however, agree with the parties that the abstract of judgment should be corrected to accurately reflect the second charge of which Ugarte was convicted, cruelty to a child by endangering health (§ 273a, subd. (b)).  In all other respects, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Ugarte and Hernandez, known as "Lupe," were married and had two children.  They moved to Arizona early in their marriage and then separated

_____

[1] All statutory citations herein are to the Penal Code.

1

when Hernandez returned to California with the children in 2010. Five years later, Ugarte came back to California and lived with Hernandez again.

Beginning in 2017, Hernandez reconnected on Facebook with her boyfriend from her teenage years, Saul A. Ugarte discovered this and accused Hernandez of cheating on him. He moved out of the family home and said he wanted a divorce, but he moved back a few months later. In 2018, Ugarte resumed a relationship with his own ex-girlfriend in Arizona.

In February 2020, Ugarte, Hernandez, and the children lived in Hayward, in a house with a detached studio where Hernandez's sister resided with her husband. Around this time, Ugarte argued with Hernandez once or twice a week and physically abused her in front of the children. Hernandez's sister noticed more beer cans piling up in the yard than usual.

On Sunday, February 2, 2020, Ugarte sent a text message to Hernandez: " 'I'm glad I saw that shit on your phone today . . . we are done.' " Hernandez asked him to " 'come home' " and texted the next day, " 'I love you and only you.' " Over the course of the next two days, Ugarte sent threatening messages to Saul A. on social media. In the early morning on February 4, 2020, Ugarte searched the Internet for information about divorce, flights to Arizona, and a restaurant where Hernandez and Saul A. had once met.

I.   *The Day of the Murder.*

Around 8:00 a.m. on February 4, 2020, Hernandez went to work. She was crying and had bruises on her arms. She told a coworker she had a fight with her husband over the weekend, after he went through her phone. She said she was scared and done with her marriage and was going to take her children to her mother's house.

That afternoon, Hernandez's brother-in-law did laundry in the main house. He saw Ugarte on the couch using his phone, watching television, and

drinking from a can. Hernandez's sister also saw Ugarte sitting on the couch. She spoke to him, but he did not acknowledge her, even after she waited a full minute for a response. Instead, Ugarte immediately stood up, moved around, and then sat down again with his back to Hernandez's sister.

Around 4:30 p.m., Ugarte picked up his 11-year-old daughter Jane Doe from school and drove her home. Doe noticed that his eyes were red and he looked angry and mean, but he walked and drove normally. She did not think Ugarte was drunk. When they arrived home, Doe went to her room to relax. Ugarte texted Hernandez about taxes and divorce paperwork. She responded, " 'Whatever you want Elmer.' "

Then Ugarte's texts became threatening: " 'It's weird how the tables turn in an instant. . . . [Y]our brother [is] . . . getting married and you're getting a divorce for Valentine's Day.' " When Hernandez did not respond, Ugarte texted: "[Looking] for your boyfriend Saul . . . . im [*sic*] about to publicate all of your fucking messages on messenger onto Facebook stupid.' " Then: " 'Are you Happy Now. . . done. . .bitch. . .' " " 'Where else do you want it publicated. . .????' " Hernandez did not respond by text, but she and Ugarte had a three-and-a-half minute phone call after he sent these messages.

Immediately after that call, Hernandez called Doe. She sounded scared and told Doe, " 'Lock your door. Your dad is drunk.' " She told Doe to pack her things. Hernandez picked up her son from his school and drove home, where he waited in the car.

Around 5:30 p.m., Hernandez went in the house, knocked on Doe's door and said, " 'Open. It's me. Let's go.' " She sounded panicked. Doe opened her door and walked down the hall to the front door with Hernandez. Ugarte walked past them and went into the main bedroom. He looked angry. He

3

said, " 'Lupe, get the fuck over here,' " and Hernandez went into the bedroom with him. The bedroom door closed.

About 15 seconds later, Doe heard Hernandez scream loudly. The bedroom door opened, and Doe saw her father stabbing her mother. Ugarte had a knife in his right hand and held Hernandez by the collar of her shirt with his left hand. Hernandez tried to push Ugarte away as he continued to stab her in the chest. Ugarte stabbed Hernandez about 10 times while Hernandez screamed and told Doe to call 911.

Doe screamed at Ugarte to stop, and Hernandez fell to the floor. Ugarte continued to stab Hernandez, about five more times. Doe picked up one of her shoes and threw it at Ugarte's head. The shoe hit him and he looked at her—"[he] was angry" and this "[t]errified" Doe—but he continued stabbing Hernandez. Doe started hitting Ugarte over the head with her other shoe, which finally made him stop.

Doe grabbed her phone and called 911. Ugarte walked past her and went into the kitchen, where Doe heard him washing off the knife. While Doe was speaking with a 911 dispatcher, Ugarte called her stupid and disrespectful. He said, " '[Hernandez] cheated on me. She treated me bad. That's what she gets.' " Then he walked out of the house and drove away. Around this time, Ugarte texted his mother, " 'Bye mom. I'm going to jail now for killing Lupe. Ok, Whatever. I'm a . . . "asshole badass." ' "

At 5:50 p.m., first responders arrived at the house and pronounced Hernandez dead. She had 34 stab and incised wounds, including stab wounds to her heart, lung, and liver. A knife with an eight-inch blade and Hernandez's blood on it was recovered from the kitchen sink.

Around 6:30 p.m., Ugarte's cousin called him after hearing he hurt Hernandez. Ugarte was on the phone with his cousin for an hour while he

4

was driving. He told his cousin he stabbed Hernandez. He said, " 'She fucking cheated on me with that fucking guy. She thinks I'm stupid.' " He called Hernandez a " 'bitch' " and a " 'liar.' " He admitted killing her more than 10 times during this call and repeated Saul A.'s name "probably like a hundred times . . . ."

Before he was arrested, Ugarte texted Hernandez's phone, " 'Good bye Lupe . . . . I hope Saul . . . was the love of your life.' " Then he called his ex-girlfriend. He said he had messed up and done " 'something bad' " and she would not be seeing him for a while. He sounded upset but not intoxicated. Around 7:45 p.m., officers arrested Ugarte about 30 miles from the Hayward house.

When he was arrested, Ugarte smelled of alcohol. He complied with officers' instructions but requested a blood draw. He said he had been blacked out. His blood was drawn around 12:30 a.m. on February 5, 2020, several hours after he killed Hernandez. His blood-alcohol level was 0.15 percent.

## II. *The Trial and Jury Verdict.*

A grand jury indicted Ugarte with murder (§ 187, subd. (a)) and a misdemeanor violation of cruelty to a child by endangering health (§ 273a, subd. (b)). At trial, the prosecution pressed for a verdict of first degree murder. The defense conceded that Ugarte killed Hernandez and intended to do so. However, they argued he should be convicted of voluntary manslaughter because he killed in the heat of passion. The defense also claimed Ugarte was so impaired by alcohol he was in "a stupor" and acting on impulse, making his crime second degree murder at most.

A defense expert testified about the effects of alcohol and about retrograde extrapolation, a method of using an individual's blood-alcohol content at one time to estimate what it was at a prior time. The expert

5

testified that alcohol causes individuals to "act on impulse," with reduced inhibition and emotional stability. They "may" be "[un]aware of current events" and "the consequences and things that [they]'re doing." The blood-alcohol level at which these impairments manifest "may vary greatly depending on the person's individual experience with alcohol . . . ." The expert indicated a normal to heavy drinker with Ugarte's weight and blood draw result would have had a blood-alcohol content of 0.25 or 0.29 at the time of the murder—corresponding to at least 15 drinks. With blood alcohol of approximately 0.30, an individual would experience "somnolence, sleepiness, [and] drowsiness" and "[t]he body is basically sort of shutting down." "[S]omewhere approaching . . . 0.30 percent" an individual reaches "the comatose level."

The trial court gave the standard instructions for first and second degree murder. (CALCRIM Nos. 500, 520 & 521.) The court also instructed on the lesser included offense of voluntary manslaughter—heat of passion. (CALCRIM No. 570.) The court instructed with CALCRIM No. 522, explaining that provocation may reduce a murder from first to second degree or to manslaughter. The court also instructed the jury with CALCRIM No. 625 to consider evidence of Ugarte's voluntary intoxication "only in deciding whether [he] acted with an intent to kill, or [he] acted with deliberation and premeditation."

The jury acquitted Ugarte of first degree murder and convicted him of second degree murder; it convicted him of child cruelty as charged. The trial court sentenced him to 16 years to life in prison.

## DISCUSSION

Ugarte claims the trial court had a sua sponte duty to instruct the jury on the lesser included offense of involuntary manslaughter based on

6

unconsciousness from voluntary intoxication. (CALCRIM No. 626.)[2] We disagree. As we will explain, there was no substantial evidence Ugarte was unconscious when he murdered Hernandez. However, we agree with the parties that the abstract of judgment must be amended to reflect that Ugarte's additional conviction was for cruelty to a child by endangering health.

## I.    *Legal Background.*

"A trial court has a sua sponte duty to instruct the jury on any uncharged lesser offense . . . necessarily included in a charged offense if there is substantial evidence" the defendant committed the lesser offense but not the charged one. (*People v. Lopez* (2020) 9 Cal.5th 254, 269.) The duty persists even when a defendant fails to request the instruction, presents an inconsistent defense, or objects to the instruction for tactical reasons. (*People v. Barton* (1995) 12 Cal.4th 186, 195; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) This " 'venerable' " rule encourages the most accurate verdict possible based on the pleadings and evidence, " 'prevent[ing]

---

[2] CALCRIM No. 626 explains that "[v]oluntary intoxication may cause a person to be unconscious of his or her actions" although "still . . . capable of physical movement . . . ." The instruction explains that a person who "voluntarily causes his or her own intoxication to the point of unconsciousness . . . assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life": If someone dies as a result, the killing is involuntary manslaughter. The instruction lists four elements that the jury must find beyond a reasonable doubt to support an involuntary manslaughter conviction: (1) the defendant killed without legal justification or excuse; (2) the defendant did not act with the intent to kill; (3) the defendant did not act with a conscious disregard for human life; and (4) as a result of voluntary intoxication, the defendant was not conscious of his or her actions or the nature of those actions. The instruction concludes, "The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. . . ."

7

either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense . . . or complete acquittal . . . .' " (*People v. Smith* (2013) 57 Cal.4th 232, 239.)

The trial court's duty requires instruction on involuntary manslaughter "when there is evidence deserving of consideration that the defendant was unconscious due to voluntary intoxication." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 418 (*Halvorsen*); see CALCRIM No. 626.)[3]  However, a court need not instruct on this or any theory if it lacks substantial evidentiary support.  (*People v. Smith, supra*, 57 Cal.4th at p. 240.)

We address this issue de novo, viewing the evidence in the light most favorable to Ugarte.  (*People v. Millbrook, supra*, 222 Cal.App.4th at p. 1137.) We do not evaluate the credibility of evidence, which is the jury's role.  (*Ibid.*) Still, substantial evidence does not mean *any* evidence, no matter how weak, but is evidence a reasonable jury could find persuasive.  (*People v. Wilson* (2021) 11 Cal.5th 259, 298.)  It does not include evidence that is "[s]peculative, minimal, or insubstantial . . . ." (*People v. Simon* (2016) 1 Cal.5th 98, 132.)

## II.     *There Was No Substantial Evidence of Unconsciousness to Support the CALCRIM No. 626 Instruction.*

While Ugarte presented evidence that he was highly intoxicated during the murder, no reasonable jury could find he was unconscious when he stabbed his wife 34 times.

---

[3] Contrary to the People's argument, the issue is not forfeited when  a defendant fails to request this particular instruction.  *People v. Saille* (1991) 54 Cal.3d 1103 is not to the contrary.  The issue in that case was whether there is a duty to instruct "on the relationship between voluntary intoxication and premeditation and deliberation." (*Id.* at pp. 1118, 1120.)  This pinpoint instruction was given in our case.

A.  *Proving an Act Was Unconscious.*

In general, an unconscious act is one " 'committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1315, italics omitted.)  The instruction at issue here is consistent:  "As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions."  (CALCRIM No. 626.)  "[U]nconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*Halvorsen, supra*, 42 Cal.4th at p. 417; see CALCRIM No. 626 ["A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions"].)

"[W]e begin with the presumption that a person who appears to act in [a] state of consciousness is conscious." (*People v. James* (2015) 238 Cal.App.4th 794, 804.)  The burden is on the defendant to produce evidence rebutting this presumption.  (*Ibid*.)  Minimal evidence does not suffice, particularly when the defendant's actions and statements are otherwise inconsistent with unconsciousness.  (See *Halvorsen, supra*, 42 Cal.4th at p. 418.)  Evidence of habitual drinking, memory loss, and/or a high blood-alcohol content at the time of a killing—standing alone—is inadequate.  (See *id*. at pp. 418–419.)

B.  *The Evidence Was Inconsistent with Unconsciousness.*

Ugarte's actions before, during, and after the stabbing were wholly inconsistent with unconsciousness.  In the hour leading up to the murder, he picked his daughter up from school and walked and drove normally.  He texted Hernandez about getting a divorce and threatened to publicly expose

9

her relationship with Saul A. When Hernandez got home, Ugarte ordered her to come into their bedroom and almost immediately began to stab her. He kept stabbing even when Hernandez fought back and when his 11-year-old daughter threw a shoe at him and screamed at him to stop. Still, he was not oblivious to his daughter's efforts. He turned and gave her an "angry" look when her shoe hit him and finally stopped his attack when she began hitting him over the head with her other shoe.

After the attack, Ugarte walked into the kitchen and washed the knife. This demonstrated his immediate awareness that he had committed a crime by slaying Hernandez. Then, Ugarte repeatedly admitted and tried to justify the killing. He said Hernandez " 'cheated on [him]' " and " '[t]hat's what she gets.' " He texted his mother, " 'I'm going to jail now for killing Lupe.' " On the phone with his cousin, he admitted killing Hernandez more than 10 times and repeated Saul A.'s name dozens of times, continuing to blame his crime on his wife's relationship with her ex-boyfriend. Just before he was arrested, Ugarte texted Hernandez " '[g]ood bye' " and told his own ex-girlfriend that he had done " 'something bad' " and she would not see him for a while.

This evidence showed that—while Ugarte may have been very emotional and not entirely rational—he was conscious of his actions and understood their consequences. Ugarte's own statements about the murder and the "purposive nature of his conduct" in ordering Hernandez into their bedroom to stab her after they had been fighting for days (if not years) made it "clear that he did not lack awareness of his actions during the . . . offense[]." (*Halvorsen, supra*, 42 Cal.4th at p. 418; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1227–1228 [no substantial evidence of unconsciousness where defendant told others what he did and why and tried to hide the murder weapons]; *People v. Ochoa* (1998) 19 Cal.4th 353, 424

10

[no substantial evidence of unconsciousness where defendant took his victim to a secluded place and gave her commands].)[4]

C. *Evidence of Unconsciousness Was Insubstantial.*

Ugarte relies entirely on evidence of his alcohol abuse and his blood-alcohol content after the murder to support an inference he was unconscious when he stabbed Hernandez to death. However, the defense expert who testified about these subjects never offered an opinion that Ugarte was unconscious during the murder. Rather, he opined that a normal to heavy drinker with Ugarte's weight and blood draw result would have had a blood-alcohol level between 0.255 and 0.29 at the time of the murder if they did not continue drinking in the meantime; a chronic alcoholic could eliminate alcohol faster, presumably resulting in a higher blood-alcohol level in the hours prior.[5] The expert then explained that with a blood-alcohol level around 0.30, an individual is typically "entering a comatose level and the body is shutting down." He acknowledged, however, there are people who can function with extremely high levels of blood alcohol, and a "chronic drinker"

---

[4] Ugarte seems to claim we should not consider evidence he "act[ed] like a conscious person" and "in a way that appeared purposeful" because weighing this against evidence he was unconscious is the jury's role. This is true only when there is substantial evidence of unconsciousness: where a "reasonable jury could infer *from the evidence as a whole*" that Ugarte was unconscious. (*People v. Holloway* (2004) 33 Cal.4th 96, 140, italics added.) We consider all of Ugarte's behavior in determining whether there was such evidence here.

[5] Ugarte claims that based on testimony that chronic alcoholics can burn alcohol twice as fast as others, a jury could have found his blood-alcohol level at the time of the stabbing was between 0.36 and 0.43. This is speculative; the expert never testified about how to calculate past blood alcohol for chronically heavy drinkers. Even assuming Ugarte had such a high blood-alcohol level, this does not amount to substantial evidence he was unconscious considering the rest of the evidence presented at trial.

may not experience lethargy and unconsciousness until their blood-alcohol level is higher than 0.30. Mental impairments, too, "may vary greatly depending on the person's individual experience with alcohol previously and . . . how frequently and how much they drink."

We assume the evidence supports a finding that Ugarte was a chronic alcoholic. However, there was no evidence that, with a blood-alcohol level approaching or exceeding 0.30, he would have been unaware of his actions or their nature. Ugarte's expert certainly did not suggest a person acting the way Ugarte did before, during, and after the murder could have been unconscious. The expert's general, hypothetical testimony about blood-alcohol content was not substantial evidence that Ugarte was unconscious when he stabbed his wife to death. (See *People v. Ochoa, supra*, 19 Cal.4th at pp. 390, 424 [no duty to instruct on manslaughter based on voluntary intoxication; expert testimony "did not pertain to defendant's own psychology or his mental state at the time of the crimes, but rather on the possible effects of drug use generally"].)

The evidence of unconsciousness is far weaker here than in *Halvorsen, supra*, where it fell short of supporting a manslaughter instruction. In that case, an expert testified the defendant had bipolar disorder with psychosis and the defendant testified there were gaps in his memory and he did not consciously pull the trigger when shooting one of several seemingly random victims. (42 Cal.4th at pp. 417–418, 421.) The Supreme Court found this did not amount to substantial evidence of unconsciousness considering the other evidence in the case. (*Id.* at p. 418.)

Missing in *Halvorsen* and in this case was substantial evidence—expert testimony, direct testimony by the defendant, or something else—concerning the defendant's actual state of mind and unawareness of his actions.

(See, e.g., *People v. James, supra*, 238 Cal.App.4th at pp. 801, 809–810 [defendant tried to climb a building, ran around " 'crashing his head into cars and garbage cans,' " never responded to commands, and "was mumbling incoherently"; expert concluded he was unaware of his actions due to psychosis]; *People v. Newton* (1970) 8 Cal.App.3d 359, 373 [defendant testified he was unconscious and expert confirmed this was consistent with shock from an abdominal gunshot wound].)

In sum, the evidence that Ugarte was unconscious was insubstantial. The trial court had no duty to instruct on involuntary manslaughter based on unconsciousness from voluntary intoxication. Given this conclusion, we need not address the parties' arguments about whether any error by the trial court in this regard was prejudicial.

## III. *The Abstract of Judgment Must Be Corrected.*

Finally, the abstract of judgment indicates that Ugarte was convicted of cruelty to a child by inflicting injury (listed as a violation of § 273, subd. (b)(1)), but he was convicted of cruelty to a child by endangering health (§ 273a, subd. (b)). The parties agree—as do we—that the abstract should be amended to correct this apparent clerical error. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–188.)

## DISPOSITION

The trial court is directed to prepare a corrected abstract of judgment in accordance with this opinion. The trial court shall forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Jackson, P. J.

WE CONCUR:

Simons, J.
Chou, J.

A167452/*People v. Elmer Ugarte*

14