Filed 1/30/25  P. v. Reynoso-Lozano CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SERGIO REYNOSO-LOZANO,<br><br>    Defendant and Appellant. | A168929<br><br>(Humboldt County Super. Ct. No. CR2201046) |

Defendant Sergio Reynoso-Lozano appeals a judgment following a jury trial in which he was convicted of multiple sex crimes against his daughter and his daughter's half-sister.  Both girls were around nine years old when the crimes allegedly began.  The trial court sentenced Reynoso-Lozano to a determinate term of two years eight months and a consecutive indeterminate term of 50 years to life in state prison.  On appeal, Reynoso-Lozano contends that reversal is warranted because the court abused its discretion in denying his motion for a new trial, erred in allowing certain expert testimony regarding child sexual abuse accommodation syndrome (CSAAS), and erred in instructing the jury that the defense of unconsciousness could not be based on voluntary intoxication as applied to specific intent crimes.  We disagree

1

and affirm.

# I.  BACKGROUND

## A.  Procedural History

A first amended information charged Reynoso-Lozano with lewd acts upon a child under the age of 14 years (Pen. Code,[1] § 288, subd. (a); counts 1 to 4) and lewd acts upon a child 14 or 15 years old (§ 288, subd. (c)(1); counts 5 to 9).  As to counts 1 to 4, the information alleged that Reynoso-Lozano committed the offenses against more than one victim.  (§ 667.61, subd. (e).)  As to all nine counts, the information alleged that the victims were particularly vulnerable and that Reynoso-Lozano took advantage of a position of trust or confidence.  (§ 1170, subd. (b)(2).)

Following a trial, the jury found Reynoso-Lozano guilty on all counts except for count 8, which was dismissed after the jury was unable to reach a unanimous verdict and a mistrial was declared.  The jury found true the special allegations that there were multiple victims, that the victims were particularly vulnerable, and that Reynoso-Lozano took advantage of a position of trust or confidence.  The trial court subsequently denied Reynoso-Lozano's motion for new trial.  The court then sentenced him to a determinate term of two years eight months, consecutive to an indeterminate term of 50 years to life in state prison.  Reynoso-Lozano timely appealed.

## B.  Trial Testimony

### 1.  *Jane Doe 1*

Jane Doe 1 was born in September 2010.  Reynoso-Lozano is her biological father.  Jane Doe 2 is her older half-sister and was born in

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

December 2006.  They also have a brother, John Doe, who was born in February 2009.  Reynoso-Lozano is not the biological father of Jane Doe 2 or John Doe.  All three siblings lived with their grandmother but stayed with Reynoso-Lozano occasionally.  When they stayed with Reynoso-Lozano, Jane Doe 1 and Jane Doe 2 slept in the same bed with him while John Doe slept on the floor.  Jane Doe 2 usually slept in the middle of the bed between Reynoso-Lozano and Jane Doe 1, although Jane Doe 1 sometimes slept in the middle when Jane Doe 2 asked her to switch places.

Jane Doe 1 testified that when she was eight or nine years old and was sleeping in the middle of the bed, Reynoso-Lozano put his hand underneath her shirt and bra and touched her breast.  He did not say anything but left his hand there until he fell asleep.  Jane Doe 1 testified that something uncomfortable like this happened every time she slept in the middle of the bed between Reynoso-Lozano and her half-sister.  She also recalled that Reynoso-Lozano "put his hand on [her] butt" over her clothes when they were walking to the store.  She estimated that this happened about 10 times.  She also recounted other incidents where he "put his hand in [her] pants" when they were walking and when they were lying down in bed.  This made her uncomfortable.  During some of the touchings that occurred in bed, Jane Doe 1 thought Reynoso-Lozano was asleep because she heard him snoring.

When Jane Doe 1 was 10 years old, she recalled an incident where Reynoso-Lozano had been drinking in the living room and came into the bedroom.  Jane Doe 1 was lying on her side in the middle of the bed and Reynoso-Lozano was lying behind her.  The "same sort of touching" occurred.  She did not do anything, and the touching eventually stopped when Reynoso-Lozano turned around.  Jane Doe 1 also testified that sometimes, she saw him "stick his hand up [Jane Doe 2's] shirt when they were lying

3

down in bed or "put his hand up her shirt" when they were walking. On several nights when Jane Doe 1 was around 10 years old, she was lying on the edge of the bed and felt Reynoso-Lozano's hand moving around behind her in Jane Doe 2's bra.

2. *Jane Doe 2*

Jane Doe 2 testified that she first met Reynoso-Lozano when she was six or seven years old and considered him to be a father figure. She was around nine years old when she started staying at his house with Jane Doe 1 and John Doe. All three of them slept on one bed with him. Jane Doe 2 slept on the edge next to Reynoso-Lozano, John Doe slept in the middle, and Jane Doe 1 slept against the wall. Jane Doe 2 recalled an incident where she was facing away from Reynoso-Lozano and he started cuddling with her and put his hand under her shirt, right below her chest. He left his hand there for a while and Jane Doe 2 did not do anything.

Jane Doe 2 recalled another incident that occurred when she was about 11 years old. Reynoso-Lozano had moved into an apartment and Jane Doe 2 was lying on the bed with him while Jane Doe 1 and John Doe were at the foot of the bed watching television. Reynoso-Lozano put his hand in Jane Doe 2's shirt and placed it near the bottom of her bra. Not wanting to be there, she left and sat in the bathroom for a few minutes before returning to the foot of the bed to watch television with her siblings.

When Jane Doe 2 was 13 years old, Reynoso-Lozano moved into another apartment that had a smaller bed than his previous one. On a few occasions, Jane Doe 2 stayed there overnight without her siblings. One of these nights when she was 14 years old, she was sitting on the bed looking at her phone while Reynoso-Lozano was lying next to her. He initially placed his arm on her stomach but moved it up towards her chest later that

4

night. His hand went under her bra and held her breast. His eyes were closed so Jane Doe 2 believed he was asleep. She moved his hand away at least three times but he moved it right back to her breast each time. Eventually, Jane Doe 2 got up and went to the bathroom for a few minutes to wait for him to fall back asleep or until she "thought it was safe to go back." Jane Doe 2 also recalled a few incidents when she was around 14 years old where she was lying on her side and Reynoso-Lozano was behind her and it felt like his penis was touching the skin on her back.

On another night when Jane Doe 1 was also staying at this apartment, Jane Doe 2 was lying in the middle of the bed and Reynoso-Lozano lay next to her. She smelled beer on his breath and faced away from him. He started cuddling with her, put his hand underneath her bra, and left it on her breast. Jane Doe 2 tried to "wiggle his hand outside [her] shirt." Reynoso-Lozano "normally [took] his hand out" when this happened. Jane Doe 1 was on her phone facing the opposite direction when this touching occurred. On about four occasions, Reynoso-Lozano not only left his hand on Jane Doe 2's breasts but also squeezed them. On about three occasions, she felt the bed shaking after Reynoso-Lozano touched her breasts and believed he was masturbating. She could not see anything because it was too dark but heard what "sounded like toilet paper moving."

When Jane Doe 2 was 15 years old, she was in the middle of the bed cuddling with Jane Doe 1. Reynoso-Lozano was lying behind Jane Doe 2, and she felt his hand around her waist and move into her pajama pants. He started rubbing her buttocks without saying anything. She "wiggled his hand out of [her] pants," went to the bathroom, and tied her pants tight so he could not stick his hand in them.

Jane Doe 2 also testified that there were other times when Reynoso-

5

Lozano put his arm around her, stuck his hand down her shirt, and held her breast as they walked to the store. Jane Doe 1 and John Doe were also with them. Jane Doe 2 believed she was about 13 years old when these incidents started.

### 3. *Disclosure of Abuse*

At some point, Jane Doe 1 and Jane Doe 2 were in their bedroom talking, and Jane Doe 1 shared that another girl had inappropriately touched her at school when she was eight or nine years old. Jane Doe 2 started crying and told her that someone had been inappropriately touching her as well. Jane Doe 2 did not tell anyone earlier because she was scared it would interfere with Jane Doe 1's relationship with her father. When Jane Doe 1 pieced together that it was Reynoso-Lozano, she was "furious that someone would do that to [Jane Doe 2]." Jane Doe 1 also realized that Reynoso-Lozano had done the same thing to her. She too had been scared to tell anyone because she did not want her family to hate him or him to hate her. A few days later, Jane Doe 1 told her counselor about what Jane Doe 2 told her. The counselor told the sisters' mother and grandmother, and the police got involved.

### 4. *John Doe*

John Doe briefly testified that he would sleep on the floor most of the time when he stayed over at Reynoso-Lozano's house with his sisters. He sometimes asked if he could sleep on the bed, but Reynoso-Lozano told him, " 'There is no room on the bed.' " John Doe recalled times when Reynoso-Lozano came into the bedroom and "smack[ed] [Jane Doe 1 and Jane Doe 2's] butts." John Doe thought this was "a little weird" but was not too concerned because the smacking "didn't seem aggressive."

6

### 5. *CSAAS Expert*

Dr. Anthony Urquiza, an expert in child sexual abuse and its impact, testified for the prosecution. Aside from Reynoso-Lozano's name, Dr. Urquiza knew nothing about the case and did not review any case materials. Instead, he testified about the research on what commonly occurs in children who have been sexually abused—specifically, a 1983 article titled "Child Sexual Abuse Accommodations" (article). He explained that the purpose of the article was "to educate therapists" and "to dispel any myths or misunderstandings that those therapists might have." Urquiza discussed the categories of behaviors by victims of child abuse identified in the article: secrecy, helplessness, entrapment and accommodation, and delayed disclosure.

## II. **DISCUSSION**

### A. Denial of New Trial Motion

Reynoso-Lozano contends that the trial court abused its discretion when it denied his new trial motion because it stated that the evidence was "sufficient to hold him to answer." We disagree. While the court may have used some problematic language, the record as a whole establishes that it applied the correct legal standard in denying the motion.

### 1. *Relevant Procedural History*

Following the verdict, Reynoso-Lozano filed a motion for new trial, arguing that the evidence was insufficient to support his conviction on count 4, which were based on three lewd acts against Jane Doe 2 when she was under the age of 14. As to the first two incidents of touching that occurred while they were lying in bed together, Reynoso-Lozano argued that the evidence only showed that he put his hand on her stomach and indicated nothing about his intent. As to the third incident of touching at the store,

Reynoso-Lozano argued that there was "extreme ambiguity" over whether Jane Doe 2 was under the age of 14 at the time.

At the hearing on the motion, the trial court was not persuaded that the first two incidents involved an "unknown intent or innocent intent" on Reynoso-Lozano's part. Instead, the court concluded, "because of the wealth of evidence of his behavior with the other victim and with this victim where it is repeated and it leaves really no doubt probably in the jurors' mind, *but in my mind* that it was a sexual intent." (Italics added.) The court then stated, "Circumstantial evidence *is sufficient to hold him to answer* as to Count 4. I agree that if that were the totality of the evidence, that there was no other behavior on any other victim or any other day, then that it would be more questionable. But the jury and *the Court* is allowed to look at the entirety of the evidence when determining intent. Because it becomes part of a plan and scheme." (Italics added.)

With respect to Jane Doe 2's age, the trial court reasoned that although there was some inconsistencies in Jane Doe 2's testimony, "on a totality of the evidence, looking at her sister's estimates of their ages, looking at her prior statements, looking at the calendar, *the Court* believes that there was sufficient evidence *to hold him to answer* as to that *beyond a reasonable doubt* and there is insufficient reason for the Court not to deny the motion." (Italics added.)

### 2. *Law and Standard of Review*

Following an adverse verdict against a defendant, the trial court "may, upon his application, grant a new trial [¶] . . . [¶] [w]hen the verdict or finding is contrary to law or evidence." (§ 1181, subd. (6).) "In reviewing a motion for a new trial, the [] court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of correctness of

8

the verdict and proceedings supporting it. [Citation.] The [] court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' " (*People v. Davis* (1995) 10 Cal.4th 463, 523–524 (*Davis*).) At the same time, the court "has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion." (*Id.* at p. 524.)

We review the trial court's ruling on a new trial motion for abuse of discretion. (*People v. Ochoa* (1998) 19 Cal.4th 353, 473.)

### 3. *No Abuse of Discretion*

Reynoso-Lozano argues that the trial court abused its discretion in denying his new trial motion because it "did not appear to understand the legal framework that it was required to apply to its analysis." Specifically, he points to the court's use of the phrase "hold him to answer" and the term "sufficient evidence." Reynoso-Lozano correctly notes that the phrase "held to answer" is typically used in preliminary hearings to mean that the court has found probable cause that the defendant committed the charged offenses. (§ 872, subd. (a).) He also contends that the term "sufficient evidence" indicates that the court only determined whether the evidence was sufficient to support the *jury's* finding rather than evaluate the evidence de novo. However, a review of the court's entire ruling demonstrates that it did not apply a probable cause standard and that it did weigh the evidence independently when it found sufficient evidence to support Reynoso-Lozano's conviction on count 4.

As to Reynoso-Lozano's intent, the trial court stated that it had a "hard time believing" his argument. In rejecting it, the court expressly considered

9

"the wealth of evidence" of Reynoso-Lozano's pattern of inappropriately touching Jane Doe 1 and Jane Doe 2 and concluded that it left "*no doubt*" in "[*its*] *mind*" that he had a sexual intent. (Italics added.) The court also noted that, like the jury, it was "allowed to look at the entirety of the evidence when determining intent." Similarly, the court looked at the "totality of the evidence," including Jane Doe 2's prior statements and Jane Doe 1's testimony, in concluding that Jane Doe 2 was under the age of 14 when the offenses underlying count 4 occurred. It then emphasized that "*the Court* believes that there was sufficient evidence to hold him to answer to that *beyond a reasonable doubt*." (Italics added.)

Viewed in context, the court's statements do not evidence a focus on probable cause. Other than its inapt use of the phrase "hold him to answer," there is nothing to suggest that the court applied a probable cause standard. Indeed, neither party referenced a probable cause standard in their briefs or oral arguments, and the court expressly stated that it had no "doubt" or "reasonable doubt" about Reynoso-Lozano's guilt. The court's statements also do not evidence a focus on the sufficiency of the evidence to support the *jury's* findings. Rather, they establish that the court determined that there was sufficient evidence to support Reynoso-Lozano's convictions beyond a reasonable doubt based on its own consideration of the evidence. Thus, the record as a whole establishes that the court properly denied the motion using the standard set forth in section 1181, subdivision (6).

*Davis*, *supra*, 10 Cal.4th 463, is instructive here. The defendant in *Davis* also challenged the trial court's denial of a new trial motion under section 1181, subdivision (6), pointing to certain statements made by the court in arguing that it used "an improper standard of review." (*Davis*, at p. 523.) Those statements referenced the findings and conclusions reached by

10

*the jury*, which the defendant contended was erroneous. (*Ibid*.) Our high court disagreed and concluded, "The record establishe[d] that . . . the trial court independently determined the credibility of the witnesses and the probative value of the evidence. Although defendant isolates statements in which the trial court refers to the jury's verdicts, it is clear from the record as a whole that it did not regard itself as bound by any of the jury's findings." (*Id*. at p. 524.) The same holds true here.

B. <u>Expert Testimony</u>

Reynoso-Lozano next argues that the trial court abused its discretion by overruling his objection to Dr. Urquiza's testimony about what "*commonly* happens with a child who has been sexually abused." (Italics added.) According to Reynoso-Lozano, this "opened the door" to Dr. Urquiza's subsequent testimony that "*By far*, most kids are sexually abused by somebody with whom they have some type of ongoing relationship" as well as what the "*typical*" pattern of behavior is. (Italics added.) We disagree that any of Dr. Urquiza's testimony was improper. But even if it was, we find no prejudice.

1. *Relevant Procedural History*

Before trial, the trial court addressed the permissible scope of CSAAS evidence and ruled that most of the proposed testimony by Reynoso-Lozano's CSAAS expert was not admissible. According to the court, that expert "kept . . . wanting to talk about the percentage of misreporting" as well as "the percentage of rumors," which is impermissible. Accordingly, the court held that Reynoso-Lozano's expert "will not be allowed to testify as to the non-predictive nature of CSAAS because *no one* is going to be allowed to testify that it does have [a] predictive nature." (Italics added.) This expert thereafter did not testify at trial.

11

The prosecution called Dr. Urquiza as an expert in child sexual abuse and its impact. Before he testified, the trial court instructed the jury that his testimony was "offered only to explain certain behavior of an alleged victim of child sexual abuse." The court also admonished the jury that "Dr. Urquiza's testimony about child sexual abuse accommodations[2] is not evidence that the defendant committed any of the crimes against him" and that it could only consider the testimony for purposes of evaluating Jane Doe 1 and Jane Doe 2's credibility.

Dr. Urquiza testified that the author wrote the article about CSAAS to educate therapists about "what commonly happens with a child who has been sexually abused." Defense counsel objected to his use of the word "common" and argued that it was "either over the line or close to the line" based on the court's earlier ruling regarding "percentage[s] or likelihood." The court overruled the objection, reasoning that the word "common" was used here to refer to "things we often see" and that "we are here to talk about possible responses and several responses do tend to show up and [] it wouldn't be significant if they don't show up."

Later, the prosecution asked Dr. Urquiza, "Is there anything about the type of relationship between the perpetrator and the victim that is talked about [in the article] as it relates to secrecy?" Urquiza responded, "Absolutely. By far, most kids are sexually abused by somebody with whom they have some type of ongoing relationship" and that "it's not a stranger, usually." At this point, the court asked counsel to approach the bench and told them that this testimony constituted an improper "probability statement." The prosecution asked for clarification as to what words Dr.

---

[2] The trial court granted Reynoso-Lozano's pre-trial motion to omit the word "syndrome" when discussing CSAAS before the jury.

Urquiza was not allowed to use, as the court's prior ruling only prohibited the use of percentages. The court responded, "It's one thing to say it's common for them to have . . . this characteristic or that . . . they often exhibit a certain characteristic. It is another to say what he said, which is by far most kids are abused by someone whom they have some type of ongoing relationship, which is a predictive statement . . . ." The court noted that the term "by far" has a statistical meaning but that the terms "common" or "uncommon" could still be used.

The trial court asked defense counsel whether he wanted a limiting instruction before Dr. Urquiza resumed his testimony. Defense counsel declined, replying, "I think at this point we just let it go." Later on, when the prosecution asked Dr. Urquiza to discuss helplessness, Dr. Urquiza testified that there is a "misperception" that "a child will do something to protect themselves from being sexually abused" and that, as the article explained, "that is not the typical pattern of behavior that goes on with kids." This time, defense counsel did not object.

### 2. *Law and Standard of Review*

"A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling *commonly held* myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' " (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*), italics added.) It is also admissible "to rehabilitate [the complainant's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v.*

13

*McAlpin* (1991) 53 Cal.3d 1289, 1300.)

CSAAS testimony, however, may not be used to "affirmatively vouch[] for the truthfulness of a complainant's allegations against the defendant." (*Sedano, supra,* 88 Cal.App.5th at pp. 479–480.) It is therefore "an abuse of discretion to permit a CSAAS expert to testify—either qualitatively, or with specific statistics or percentages—to the infrequency with which children make false allegations of sexual abuse." (*Id*. at p. 480.) "[T]he jury must be left to evaluate a complaining witness's testimony, together with all the other evidence, 'without statistical evidence placing a thumb on the scale for guilt.'" (*Ibid*.)

### 3. *Forfeiture and Merits*

The People contend that because Reynoso-Lozano only objected to Dr. Urquiza's use of the terms "common" and "commonly," he forfeited any claim of error as to Dr. Urquiza's subsequent testimony challenged on appeal. This includes his testimony about what is "by far" or "usually" the case for child sexual abuse victims. The People also highlight that Reynoso-Lozano did not move to strike any testimony and declined the trial court's offer to give a limiting instruction. Reynoso-Lozano counters that he preserved his claims for appellate review through his initial objection and that any additional objections would have been futile. He further claims that a limiting instruction "would only have drawn more attention to the objectionable testimony." We have doubts that a further objection would have been futile but nevertheless find that Reynoso-Lozano's arguments fail on the merits.

A defendant forfeits an argument that testimony was improper by failing to object or "by failing to obtain a ruling on his objection and failing to move that [the] testimony be stricken." (*People v. Virgil* (2011) 51 Cal.4th

14

1210, 1249.) Any such failure, however, "may be excused if it would have been futile or an admonition would not have cured the harm." (*People v. Dykes* (2009) 46 Cal.4th 731, 760.) Here, upon overruling defense counsel's objection to Dr. Urquiza's use of the term "common," the trial court noted, "I don't think that this so far has breached that line. But I will have my ears attuned for it" Later, the court asked counsel to approach the bench and told the prosecution that Dr. Urquiza "can't say things like by far they are abused by someone that they are related to" because it constituted "a probability statement." The court then asked defense counsel if he wanted a limiting instruction, but counsel declined. Reynoso-Lozano does not explain why an instruction would not have cured any harm, and based on the court's previous comments, it appears likely that it would have ruled in his favor had he objected to Dr. Urquiza's testimony about what was "typical" or "usually" the case for child sexual abuse victims.

But even assuming that further objections would have been futile, the trial court did not abuse its discretion. First, as the court correctly observed, the term "common" did not have a statistical meaning but referred to "things we often see." Indeed, Dr. Urquiza used the term in the context of discussing the myths and misconceptions about child sexual abuse victims and how the article was aimed at educating therapists in their treatment of child abuse victims. This was admissible CSAAS testimony (*Sedano*, *supra*, 304 Cal.App.5th at p. 479) that did not suggest Reynoso-Lozano's guilt or "the infrequency with which children make false allegations of sexual abuse" (*id.* at p. 480). Likewise, Dr. Urquiza's testimony that protecting oneself from being sexually abused "is not the typical pattern of behavior that goes on with kids" simply dispelled a "commonly held myth[] or misconception[] about child sexual abuse" and was therefore properly admitted. (*Id.* at

15

p. 479.) This testimony aided the jury but did not supplant its role in deciding whether Jane Doe 1 and Jane Doe 2's testimony was credible. (*Wilson v. State* (Tex. Ct.App. 2002) 90 S.W.3d 391, 393.)

Finally, although use of the term "by far" may be problematic, Urquiza only used that term to dispel another common myth about child sexual abuse: that abusers are generally strangers. In *Sedano, supra,* 88 Cal.App.5th at page 481, the Court of Appeal rejected a challenge to similar testimony from a CSAAS expert " 'that 94% of abusers were uncles or others who had a pre-existing relationship with an abused child.' " It concluded that this testimony was "not the sort of statistics" that suggested a defendant's guilt; rather, it "help[ed] the jury assess Doe's credibility in the sense that, if a juror believed [the expert], they would be less inclined to *disbelieve* Doe simply because she had a familial relationship with defendant." (*Ibid.*) Dr. Urquiza's testimony in this case is even less problematic because he did not testify about any specific percentages.

*People v. Julian* (2019) 34 Cal.App.5th 878 does not help Reynoso-Lozano. In that case, Dr. Urquiza testified that "false allegations of sexual abuse by children 'don't happen very often' " and that " '[t]he range of false allegations that are known to law enforcement . . . *is about as low as one percent of cases* to a high of maybe 6, 7, 8, percent of cases that appear to be false allegations.' " (*Id.* at p. 885.) The Court of Appeal found this testimony improper and reversed, reasoning that Dr. Urquiza's "92 to 99 percent probability evidence invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 886.) As observed in *Sedano,* "the problem in . . . *Julian* was not that the CSAAS expert used statistics in his testimony but that he used statistics *conveying that complainants almost always tell*

16

*the truth*—and therefore that the defendant was most likely guilty."
(*Sedano, supra,* 88 Cal.App.5th at p. 481.)  Here, even if the terms "by far"
and "typical" convey some statistical probabilities, Dr. Urquiza used those
probabilities solely to educate the jury about misconceptions around child
sexual abuse so it could better understand the import of the relevant
evidence bearing on a complainant's credibility.  (See *State v. Myers* (Iowa
1986) 382 N.W.2d 91, 95 ["These inadmissible opinions go a step beyond
merely aiding the fact finder in understanding the evidence and actually
invade the exclusive domain of the jury, that is, the determination of the
guilt or innocence of the accused"].)  He did not use them to "directly
comment[] on the truthfulness of" Jane Doe 1 or Jane Doe 2 (*id.* at p. 94)—
i.e., to convey that complainants "almost always tell the truth—and
therefore that [Reynoso-Lozano] was most likely guilty" (*Sedano*, at p. 481,
italics omitted).  We therefore find no error in the admission of Dr. Urquiza's
testimony.[3]

       4.  *Prejudice*

Even if Dr. Urquiza's challenged testimony was improper, there was no
prejudice.  "The erroneous admission of expert testimony only warrants
reversal if 'it is reasonably probable that a result more favorable to the
appealing party would have been reached in the absence of the error.' "
(*People v. Prieto* (2003) 30 Cal.4th 226, 247.)  Here, the jury found Reynoso-
Lozano guilty of eight of the nine counts charged against him based on

---

[3] At oral argument, Reynoso-Lozano argued that expert testimony extrapolating CSAAS studies of a subset of children known to have been sexually abused to *all* sexually abused children should be inadmissible.  But it does not appear that he made this argument below or in his appellate briefs.  In any event, Reynoso-Lozano's argument goes to the weight of that expert evidence rather than its admissibility.

detailed testimony from Jane Doe 1 and Jane Doe 2. That testimony described numerous incidents of sexual abuse committed by Reynoso-Lozano against both of them that were quite similar. The challenged statements by Dr. Urquiza also constituted only a small fraction of his testimony. Finally, before Dr. Urquiza testified, the trial court instructed the jury that his statements were "not evidence that [Reynoso-Lozano] committed any of the crimes against him." Under these facts, there is no reasonable probability that Reynoso-Lozano would have obtained a better result without the challenged testimony.

Reynoso-Lozano nevertheless contends that this was a close case because the jury requested multiple readbacks of testimony and because it hung on count 8. We are unpersuaded. Although juror requests for readbacks may suggest that deliberations were close, they may also signal that the jury simply considered the evidence carefully before reaching a verdict. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 113.) As for count 8, it involved an allegation of abuse that did not involve the use of Reynoso-Lozano's hands like the other allegations—i.e., that Reynoso-Lozano touched Jane Doe 2's back with his penis while they were in bed. The evidence supporting that allegation was also weak because Jane Doe 2 only testified that she "felt something touching [her] back." By contrast, the other counts were supported by unambiguous testimony from Jane Doe 1 and Jane Doe 2 that Reynoso-Lozano repeatedly touched them with his hands in the same inappropriate manner on multiple occasions. As to the counts on which Reynoso-Lozano was convicted, this was not a close case.

C. <u>Unconsciousness Based on Voluntary Intoxication</u>

Lastly, Reynoso-Lozano argues that the trial court erred in instructing the jury that the defense of unconsciousness could not be based on voluntary

18

intoxication. But the court did instruct the jury that it could consider voluntary intoxication in deciding whether Reynoso-Lozano acted with sexual intent. Given this instruction and the evidence and arguments presented at trial, any error was harmless.

### 1. *Relevant Procedural History*

The prosecution asked that the trial court give the "the bracketed portion" of CALCRIM No. 3425, the unconsciousness instruction—which states that " '[t]he defense of unconsciousness may not be based on voluntary intoxication.' " In response, the court noted that "[b]lackout would not be a defense to a general intent crime, even if it was voluntary intoxication. But it would be if it was a specific intent crime." Some confusion then arose over the interaction between unconsciousness and voluntary intoxication. Defense counsel commented, "If the Court says that you can only argue intoxication as to intent, which is what the instruction says, then I would. And that would be the intent as to the touching that's described. I would argue the consciousness based upon the evidence, which is circumstantial that was given on whether he was conscious at the time." The court responded, "So if he's unconscious, end of story. If you find that he was conscious, then you may take into consideration the alcohol." Defense counsel replied, "Right. That's exactly it."

Accordingly, the trial court gave instructions on both unconsciousness and voluntary intoxication. Using CALCRIM No. 3425, the court instructed in relevant part that Reynoso-Lozano was not guilty of any counts "if he acted while unconsciousness. Someone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move. [¶] Unconsciousness may be caused by sleep. [¶] The defense of unconsciousness may not be based on voluntary intoxication." And using

19

CALCRIM No. 3426, the court instructed in relevant part that: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence in deciding whether the defendant acted with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child."[4]

During closing arguments, defense counsel explained why Reynoso-Lozano's voluntary intoxication precluded a finding of sexual intent: "What I'm arguing is that there is certainly evidence that Mr. Reynoso[-]Lozano was drinking. *I'm not saying he was blacked out drunk* and had no idea what he was doing. *That would be ludicrous.* That would be ludicrous based upon what we know in this case. So I'm not arguing that. But I am arguing that you can take into consideration that these touchings, when they happened, didn't have the intent. *Not because he's blacked out drunk*, but maybe he's just sloppy and he's sleeping in a small bed with his daughters." (Italics added.)

During rebuttal, the prosecution responded that there was no evidence that Reynoso-Lozano was "sloppy" or that he was so intoxicated that he could not form the intent to molest Jane Doe 1 and Jane Doe 2. She then emphasized, "You might have heard evidence of hard alcohol. But in this case, we just have beer. You might have heard the girls talking about witnessing him passing out, falling over, having slurred speech, talking nonsense, being incoherent. We have none of that." She concluded that based on the evidence, it would be "unreasonable" for the jury to conclude

---

[4] In connection with the charges of lewd acts upon a child, the instruction continued: "the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child."

that Reynoso-Lozano was asleep when the touchings occurred.

### 2. *Law and Standard of Review*

" 'Unconsciousness is ordinarily a complete defense to a criminal charge. [Citation.] If the state of unconsciousness is caused by voluntary intoxication, however, it is not a complete defense.' " (*People v. Kelly* (1973) 10 Cal.3d 565, 573.) Instead, it is "only a partial defense to a criminal charge—that is, it may serve to negate the specific intent or state of mind requisite to the offense." (*Ibid.*) "Therefore, if the evidence raises a reasonable doubt that the defendant was conscious at the time of the alleged criminal conduct, unconsciousness is a complete defense to both general and specific intent crimes. However, if the jury finds the unconsciousness was the result of voluntary intoxication, then unconsciousness is a defense only to specific intent crimes." (*People v. James* (2015) 238 Cal.App.4th 794, 805.)

"A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We consider the instructions as a whole as well as the record to determine "whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*Ibid.*)

### 3. *Error and Prejudice*

Reynoso-Lozano contends that CALCRIM No. 3425 misstated the law because unconsciousness based on voluntary intoxication *can* negate the specific sexual intent required for the crime of lewd acts, and that this error was prejudicial given defense counsel's focus on both alcohol and sleep. Although Reynoso-Lozano did not object below, we exercise our discretion and consider the issue because it affects Reynoso-Lozano's substantial rights. (§ 1259.) It appears that CALCRIM No. 3425, as given, may have created some confusion by suggesting that voluntary intoxication resulting

21

in unconsciousness is not a defense even though CALCRIM No. 3426 stated that voluntary intoxication may preclude a finding of sexual intent. But to the extent that there was any confusion, it was harmless under either the *Watson* or *Chapman* standards for prejudicial error. (See *People v. Watson* (1956) 46 Cal.2d 818, 837 [whether it is "reasonably probable that a result more favorable to defendant would have been reached in the absence of the error"]; *Chapman v. Cal.* (1967) 386 U.S. 18, 24 [whether the error "was harmless beyond a reasonable doubt"].)

Upon considering the instructions as a whole, any confusion created by the bracketed language of CALCRIM No. 3425 was limited at best. That language only stated that the defense of unconsciousness—a complete defense to any criminal charge—may not be invoked if the unconsciousness is due to voluntary intoxication. Meanwhile, CALCRIM No. 3426 stated that the jury may consider voluntary intoxication whenever it is deciding whether Reynoso-Lozano acted with the required sexual intent. Arguably, the two instructions, when read together, simply informed the jury that it could not rely on unconsciousness due to involuntary intoxication as a complete defense to any charges but that it could still rely on voluntary intoxication for the more limited purpose of negating any required sexual intent. But even if the bracketed language should not have been given here,[5] it precluded the jury from considering voluntary intoxication only if it found that Reynoso-Lozano's intoxication resulted in unconsciousness.

As a result, the unconsciousness instruction, even if erroneous, could not have affected the jury's verdict because there was no evidence that

_____

[5] The potential for confusion arose here because all of the charges against Reynoso-Lozano required a specific intent that could be negated by his voluntary intoxication.

Reynoso-Lozano was unconscious due to his intoxication. Jane Doe 1 and Jane Doe 2 testified that they smelled beer or alcohol on Reynoso-Lozano's breath most of the time when they stayed with him. But there was *no* evidence that Reynoso-Lozano ever drank to the point of unconsciousness, much less when he inappropriately touched the girls.[6] In fact, defense counsel expressly conceded during closing argument that he was "*not* saying [Reynoso-Lozano] was blacked out drunk and had no idea what he was doing." (Italics added.) Instead, he only argued that Reynoso-Lozano was "sloppy and . . . sleeping in a small bed . . . ."

There is also no question that the parties raised, and the jury considered and rejected, the argument that Reynoso-Lozano's drinking negated a finding of sexual intent. During closing, the prosecution argued that Reynoso-Lozano was not so intoxicated that he could not form a sexual intent. Defense counsel countered that "there is certainly evidence that [he] was drinking" and that he lacked any sexual intent "because . . . he's just sloppy and he's sleeping in a small bed with his daughters." The trial court told the jury that it may consider voluntary intoxication in determining whether Reynoso-Lozano formed the required sexual intent. By finding Reynoso-Lozano guilty on eight counts that required a finding of sexual intent, the jury necessarily concluded that his intoxication did not prevent him from forming the requisite intent.

Thus, the giving of the bracketed language in CALCRIM No. 3425, even if erroneous, was harmless beyond a reasonable doubt.

---

[6] With respect to the touchings that occurred when Jane Doe 1 and Jane Doe 2 were walking to the store with Reynoso-Lozano or watching television, he could not have been unconscious. There was also no evidence that he was stumbling or slurring his speech.

23

## III.  <u>DISPOSITION</u>

The judgment is affirmed.




                                    CHOU, J.


We concur.


JACKSON, P. J.
SIMONS, J.




(A168829)

24